MYERS *v.* ALPENA LOAN & BUILDING ASSOCIATION.

1. BUILDING AND LOAN ASSOCIATIONS—FRAUDULENT REPRESENTATIONS.

Statements by officers of a building and loan association as to how soon the shares of stock would attain their full value, and how low the rate of interest to the borrower would be, are but matters of opinion, and cannot be treated as fraudulent representations.

2. SAME—PREMIUMS—FIXED MINIMUM—VALIDITY.

Under 3 How. Stat. § 3981*h*, providing that the money of building and loan associations shall be loaned to the stockholder who bids "the highest premium" for the preference, the establishing of a minimum premium by such an association is unlawful.[1]

3. SAME—RETURN OF PREMIUMS.

A building and loan association which has loaned money to the persons offering the highest premiums, in accordance with 3 How. Stat. § 3981*h*, has no right, after the lapse of several years, to return to the borrowing stockholders the premiums bid by them, thereby depriving those who bid a premium below the average amount of their right to share in the profits derived from the premiums.

| 117 | 389 |
| 121 | 355 |
| 117 | 389 |
| 124 | 62 |
| 117 | 389 |
| s75NW | 944 |
| 131 | 503 |
| 117 | 389 |
| 139 | 1222 |
| 117 | 389 |
| 138 | 1 79 |
| 117 | 389 |
| 143 | 3123 |
| f143 | 602 |
| 143 | 3609 |

Appeal from Alpena; Kelley, J.    Submitted April 20, 1898.    Decided June 28, 1898.

Bill by Julius Myers and wife and Moses C. Myers against the Alpena Loan & Building Association to enjoin a foreclosure sale.    Defendant appeals from a decree fixing the amount due.    Affirmed.

*Joseph H. Cobb*, for complainants.

*J. D. Turnbull*, for defendant.

---

[1] The validity of fixed premiums or fixed minimum of premiums is the subject of a note to *McCauley* v. *Workingman's Building & Saving Ass'n*, (Tenn.) 35 L. R. A. 244

MOORE, J.   In 1890 Julius Myers was the owner of real estate upon which there were mortgages for $6,000, on which he was paying interest at the rate of 7 and 8 per cent.   He claims he was told by the officers of the defendant association that he could obtain money from them so it would not cost him more than 5 or 6 per cent., and that the loan would have to be made through his son, Moses C. Myers, who was then a member of the association.   He then conveyed the property to his son, and a loan was procured, secured by 77 shares of stock and a mortgage upon the real estate.   The property was afterwards so conveyed that Julius Myers and his wife are now the owners of it.   August 10, 1897, defendant commenced foreclosure proceedings by advertisement, claiming there was due $3,968.35.   November 5, 1897, complainants filed a bill and obtained an injunction restraining said sale.   After a hearing in open court, a decree was rendered by the circuit judge finding there was due upon the mortgage $3,307.37.   From that decree the defendant appeals.

The defendant association was organized under Act No. 50, Pub. Acts 1887 (3 How. Stat. § 3981a et seq.).   From the facts disclosed by the record, the transaction should be treated as though Julius Myers became a member of the association, and the loan was made to him.   It was for the purpose of accomplishing this result that the various transactions occurred.   The record shows that it was represented to Mr. Myers that he would get his money for a less rate of interest than he was then paying, and that the shares of stock would attain the full value of $100 each in five or six years.   He was also told that the defendant sold its money at auction at its stated meetings, and would not accept a bid for less than 20 per cent. premium, and that it frequently obtained a much higher premium.   June 10, 1890, 77 shares of stock were obtained by Moses C. Myers, acting for his father, at a premium of 20 per cent., which was figured upon the face value of the stock; and the mortgage in question was given for $7,700, though there

was paid to the complainant but $6,160. The principal of the mortgage was to be paid at the rate of $38.50 each month, and the interest on the principal sum at 8 per cent., amounting to $51.33 each month, until the shares of stock attained the value of $100 each. Complainants made these payments promptly until October, 1896, when they amounted to $5,081.69. Up to March, 1897, the shares of stock in the company had been issued in series,—13 series in all. The association had collected from its members, and loaned on real estate and on its stock, nearly $150,000, at an average premium of upwards of 30 per cent. It had sustained some losses, through the defalcation of one of its officers, and through the depreciation of real estate, but, according to the record, it had made large profits. In the spring of 1897, without the consent of complainants, the association voted to return to all the borrowing members the premiums they had bid for their respective loans, and this was done. At the same time the keeping of the stock in series was abolished. The accounts of all the members were readjusted, and interest was figured on the amount of the mortgages at 8 per cent., and credited upon the dues paid at 6 per cent. At the same time the practice of loaning money in open competition to the highest bidder was abolished, and the subsequent loans have been made either at a nominal premium or without any premium.

It is the claim of the complainants that the representations made to them were fraudulent, and for that reason the contract is void. It is also claimed that the subsequent acts of the association were unlawful, and deprived them of vested rights, and made it impossible for the original contract between the parties to be carried out. They filed their bill to have the original contract set aside, so far as the amount of. the mortgage, the time of payment, and rate of interest are concerned, and to be allowed to treat the transaction as a direct loan, and pay the defendant the amount of money they received, with 6 per cent. interest. The circuit judge granted complainants this relief, except that he computed the interest at 8 per cent.

It is claimed on the part of the association that the statements of its officers as to how soon the shares of stock would attain their full value, and how low the rate of interest to the borrower would be, are but matters of opinion, and cannot be treated as fraudulent representations. We think this contention is sustained by the following authorities: *Lake* v. *Security Loan Ass'n*, 72 Ala. 207; *Hammerslough* v. *Loan & Savings Ass'n*, 79 Mo. 80; *American Building & Loan Ass'n* v. *Bear*, 48 Neb. 455.

Section 11 of the act ( 3 How. Stat. § 3981$k$) provides that no premiums, fines, nor interest on such premiums shall be deemed usurious. It has already appeared that the mortgage was for $7,700, upon which interest was to be computed monthly at 8 per cent., though the complainants received in money but $6,160. Under the general laws of the State, a like transaction would be usurious, and is saved from being so only by the provisions of this statute. To entitle these associations to the privilege of charging more than the rate of interest fixed by the general law of the State, they must comply with the provisions of the law under which they are organized. Section 8 of the act ( 3 How. Stat. § 3981$h$) provides that the money to be loaned shall be offered for loan in open meeting, and that the stockholder who shall bid the highest premium for the preference or priority of loan shall be entitled to receive a loan for the amount stated in the by-laws. It has been repeatedly said that the primary purpose of these organizations was to encourage people of limited means to procure homes, and to make it possible for them to do so by advancing money to them to build their homes, secured by their stock and real estate. There are two classes of shareholders,—those who borrow, and those who do not. The shareholder whose necessities require him to borrow is entitled to have the money loaned to him, if the security offered by him is good, if he is the highest bidder. The rule to require a bid of 20 per cent. minimum premium was in contravention of this right. It

is in the interest of the nonborrowers, at the expense of the borrowers, and is contrary to the provisions of the act under which this organization exists. *Stiles' Appeal*, 95 Pa. St. 122.

It is evident that the right to charge a borrower fines, premiums, and interest on money he has never received gives him the reciprocal right, as a member of the association, to share in the profits growing out of these fines, premiums, and interest on premiums. The complainant had been a member of this company and made his payments for nearly six years, when it was decided to return to the borrowing stockholders the premiums bid by them. The complainant had a right to share in the profits derived from these premiums. It is evident that to return to one stockholder a premium of 60 per cent., and to all the stockholders their premiums, which would average upwards of 30 per cent., while there was returned to the complainant but 20 per cent., is to deprive him of a portion of the profits to which he is entitled. The practical effect of the act of the association is to compel the complainant to pay 8 per cent. interest, computed monthly, on $7,700, when he has had but $6,160, and at the same time to deprive him of any portion of the profits of the business.

The circuit judge, in computing the amount found due by the decree, figured the interest each month at 8 per cent. on the amount of money received by the complainant, added it to the principal, and deducted each monthly payment. From this decree the complainant has not appealed. The appeal of the defendant is not well taken. The decree is affirmed, with costs.

The other Justices concurred.