PHELPS *v.* AMERICAN SAVINGS & LOAN ASSOCIATION.

1. BUILDING AND LOAN ASSOCIATIONS—INSOLVENCY—APPLICATION OF PAYMENTS.

Amounts paid as dues on unmatured stock of a building and loan association cannot be applied, on the insolvency of the association, to the payment of a mortgage executed by the stockholder as security for a loan.

2. SAME—AGENTS—FALSE REPRESENTATIONS—RESCISSION—LACHES.

One who subscribes for stock in a building and loan association, and receives a certificate of membership which recites his agreement to pay a stated sum monthly for each share of stock until such share matures or is withdrawn, and states the terms upon which withdrawal will be allowed, and gives notice that agents have no authority to change the contract, and who, after making several monthly payments, offers a premium for a loan, using a blank which contains the announcement that "all that is required of the borrower is to pay interest on the loan and the monthly payments on the stock;" that, "when the stock matures, it repays the loan and premium,"—cannot after six years, when the association has become insolvent, have the contract rescinded, and the mortgage canceled to the extent of his payments, on account of the false representation of the agent who procured his application for membership, that all of the moneys paid into the association would be applied upon the mortgage and interest, and not upon the stock.

3. JUDICIAL NOTICE—STATUTES OF ANOTHER STATE—USURY.
   The courts cannot take judicial notice of the existence of a usury law in another State.

Appeal from Kalkaska; Aldrich, J.   Submitted April 4, 1899.   Decided September 27, 1899.

Bill by Cassius M. Phelps against the American Savings & Loan Association and William D. Hale, receiver, for the rescission of a contract and the cancellation of a mortgage.   Defendant Hale filed an answer in the nature of a cross-bill, asking for an accounting and foreclosure. From a decree for complainant, defendant Hale appeals. Reversed.

The following is the stock certificate referred to in the opinion:

"THE AMERICAN BUILDING & LOAN ASSOCIATION,
              "MINNEAPOLIS, MINNESOTA.

"Certificate No. 25,629.   No. of shares, 10.   Amount $1,000.00.

"This certifies that Cassius M. Phelps, of Kalkaska, county of Kalkaska, State of Michigan, is a member of the American Building & Loan Association of Minneapolis, Minnesota, and has subscribed for, and is the owner and holder of, ten shares of stock therein.   This certificate is issued to and is accepted by the holder thereof upon the following express terms and conditions:

"*First.* The shareholder agrees to pay to this association sixty cents monthly for each share until such share matures or is withdrawn.

"*Second.* Monthly payments must be made each month on or before the day of the month on which this certificate is dated.   No notices of such monthly payments shall be sent to members.   All moneys due from members to the association, or due from the association to members, shall be due and payable at the home office, in Minneapolis, Minnesota: *Provided, however,* that the members in any town may elect a local treasurer, and may make payments to him for transmission to the home office.   In such case the local treasurer will be deemed to be the agent of the members, and not of the association.

"*Third.* Fifty cents of each monthly payment on each

share, and all fines, shall go into the loan fund. The remainder of such payment, and all fees, shall go into the general or expense fund. No part of the loan fund, or interest or profits thereon, can be used for expenses of any kind, except for taxes thereon.

"*Fourth.* If any monthly payments are not paid when due, a fine of ten cents per share shall be imposed for each. month payments may be in arrears.

" *Fifth.* Stock in this association is nonforfeitable; but, if a monthly payment on any share becomes past due for a period of six months or more, such share shall be sold at auction for the purpose of paying the arrearages. The proceeds of the sale shall first be used to pay all back monthly payments and fines. The balance remaining after paying all accrued fines and monthly payments shall be paid to the member in whose name the stock stands at the time of sale. If the stock brings no more than enough to pay the accrued fines and monthly payments, it shall be bid in by the association and canceled, and all money standing to the credit thereof in the loan fund shall be considered profits to the other shareholders.

"*Sixth.* Shares in good standing may be transferred on payment to the association of a transfer fee of fifty cents per share; but in no case shall such fee be less than one dollar or more than three dollars on any certificate. Shares on which loans have been made can be transferred only to a purchaser of the mortgaged property. No transfer is good unless made on the books of the association.

"*Seventh.* At any time after one year from date, this certificate may be returned, and a new certificate for a less number of shares issued. In such case the money paid hereon (excepting the first payment) shall be applied on the new certificate, and no more payments shall be required until such money is exhausted. A fee of one dollar shall be charged for issuing the new certificate.

"*Eighth.* If a member dies, his personal representatives may withdraw his shares at any time. In no other case can a share be withdrawn until after two years from the date of the certificate. If a share is withdrawn at any time before it matures, the member will be entitled to receive a sum of money equal to the amount paid into the loan fund on such share in monthly payments, together with six per cent. annual interest. If a share has matured, it may be withdrawn at any time, and the holder

thereof will be entitled to receive $100, together with all additional profits which may have been apportioned to such share. A member desiring to withdraw his shares shall be required to give the association sixty days' notice of such intended withdrawal. A fee of fifty cents per share may be charged whenever any shares are withdrawn; but in no case shall such fee be less than one dollar or more than three dollars on any certificate. Shareholders who have borrowed money cannot withdraw their shares unless the loan is repaid. Unless the consent of the directors is obtained, the association cannot be required to use in the payment of withdrawing members in any month more than half as much money as is received for monthly payments during that month.

"*Ninth.* Once in three months the profits arising from interest, premiums, fines, and other sources shall be apportioned among the shares in good standing. Whenever the monthly payments made on any share together with the profits apportioned to such share amount to $100, such share shall be deemed to have matured, and no more monthly payments shall be required. The directors may require any share to be withdrawn at any time after it has matured. If losses occur, they shall be deducted from undivided profits, so far as possible. Any deficiency may be charged up to the shares in force.

"*Tenth.* No agent has authority to change this contract in any way, and the association assumes no obligation for any statements not contained in its printed literature."

*William D. Totten* ( *J. L. Boyd*, of counsel ), for complainant.

*F. D. Mead*, for appellant.

HOOKER, J. The American Savings & Loan Association was incorporated under the laws of Minnesota in 1887, and was a going concern until 1896, when, by reason of insolvency, it went into the hands of Hale, as receiver, under an order of a district court of that State. The complainant became a member of this association in 1889, and subsequently borrowed from it the sum of $500, for which he gave his bond and mortgage, dated September 28, 1889. He continued his payments according to the agreement

contained in his stock subscription and his mortgage and bond until April 6, 1897, when he filed the bill in this cause, alleging that he was induced to make said contract by the fraud of the agent of said association. The bill prayed that the bond and mortgage be adjudged usurious and void, and an accounting and cancellation, upon payment of amount found due, if any. The substance of his claim was that, at the time he subscribed for the stock of the association, he was told that it was necessary that he should become a member in order to obtain a loan, and that all of the money paid in would be applied upon his mortgage and interest. The circuit judge applied upon the mortgage all sums paid in, and rendered a decree that the mortgage was paid, and that the association was indebted to the complainant in the sum of $60.

The first question to be considered relates to the alleged fraud. It is obvious that the person with whom the complainant made his arrangement was the agent of the association; for it availed itself of the application taken by such person, and issued stock upon it. According to the complainant's testimony, he was called upon by the agent, who explained to him the nature of the association, and asked that he take stock in it. The complainant answered that he was not able to do so, but would like to borrow some money to complete his dwelling. After looking at the property, the agent said that the association would loan complainant $500 upon the premises, but that, in order to get the loan, it would be necessary that the complainant take 10 shares of stock in the association, and that by so doing he could get the loan at 6 per cent. interest, and could repay the same in monthly installments of $6. Complainant testified that:

"I at this time asked the agent if I could repay the loan any time I desired to. He stated that I could do so by paying to the association the difference between the amount I had already paid, plus 6 per cent. interest thereon, and the amount of money actually borrowed. Relying upon these statements of the agent, I subscribed

for 10 shares of stock.   After subscribing for the stock, I asked the agent how soon I could get the money.   He then stated to me that, under the rules of the association, I would have to wait three months, and then the loan would be forthcoming.   During the conversation he stated to me that the reason the association could do as he had told me it could do and would do was because they would receive the interest monthly upon the entire amount borrowed, and loan it in the Western States at a much higher rate than could be got in the East, and that it also had the use of the monthly payments made.   This is substantially what occurred.   *   *   *

" Q.  Whether, relying upon the statements and inducements to which you have testified, you became a borrowing member of the association.
"A.  I did."

He testified, further, that he saw no copy of the charter and by-laws of the association before he "became a borrowing member."   Upon cross-examination it was shown that a local board was organized at that time, and that the complainant signed an application for membership and 10 shares of stock, and paid a membership fee of $10. The application is dated April 13, 1889.   Printed across the face of this instrument, the following appeared in red ink at the time of the hearing:

"Agents are allowed to collect admission fees only. Other payments may be made to local collector or to the home office.   Agents have no authority to bind the association to pay debts, or to appraise property, or to promise loans at any given time or of any amount.   The contract between the association and its members is in the printed literature issued by the association, and agents have no authority to alter or amend such contract, or to make promises not in accordance with the same."

The complainant testified that he signed no paper containing the above printed in red.   Being asked if he was told that he would have to pay $6 per month as dues on his stock, he answered:   "Not exactly that; no, sir.   He told me that I would have to pay the $6 per month if I borrowed the money.   I would be paying them at the rate of $6 a month."   He continued as follows:

"*Q.* How long were these payments of $6 per month to continue?

"*A.* Seven years.

"*Q.* At which time he estimated, did he not, that your stock would mature?

"*A.* He said that after seven years I would be entitled to a discharge of my mortgage.

"*Q.* You paid, in addition to the $6 per month, two dollars and a half per month as interest on the money received?

"*A.* Yes, sir.

"*Q.* When did you stop making payments?

"*A.* I think my last payment was made in December, 1895.

"*Q.* Did you not make application to the association to become its agent here?

"*A.* Why, I don't remember making application to become an agent here, but I do remember some letter stating what commission they would pay to an agent. I think this was in the winter of 1893, before I received this statement.

"*Q.* Have you the letter that you received in response to your inquiry or letter in regard to becoming an agent?

"*A.* I think not."

After subscribing for the stock and making application for membership, the complainant soon received his certificate of stock. This, he says, was soon after April 17, 1889. It certified that he was a member, and holder of 10 shares of stock.

Under date of August 2, 1889, the complainant signed an application for a loan of $500. It contained a description of the premises, and an offer of a premium of $50 a share for the loan. It was sworn to by him, and certified by the local board. The following was printed upon the blank, viz. :

"The funds of the association will be loaned only to members. No member can obtain a loan until three months from the date of his certificate. Loans must be secured by first mortgages, and cannot exceed forty per cent. of the cash value of the real estate. Applications for loans will not be entertained at the home office unless

first approved by local boards, and, when deemed necessary, our traveling loan agent views the property before loans are granted. The rate of interest will be six per cent. per annum on the money actually loaned. All members desiring loans will be allowed to bid for the same. Members offering the highest premiums will be entitled to the loans. All interest is payable monthly. The premium is not paid in cash. But a borrower must carry stock enough so that the par value will equal the amount of the loan and premium together. All that is required of the borrower is to pay the interest on the loan and the monthly payments on the stock. When the stock matures, it repays the loan and premium.

"BIDS FOR LOANS. Bids for money must be made in writing, and be sent to the association in an envelope securely sealed, with the application for a loan. Such bids will be opened every Thursday, and will be kept on file for inspection after being opened. Any person interested may be present, either in person or by attorney, when the bids are opened. The highest bidder is supplied first, second highest bidder next, and so on as far as the money in hand will go. If two persons or more bid the same, the one offering the best security is given the. preference: *Provided* that, other things being equal, borrowers will have precedence in the order in which bids are filed. All members who have filed applications for loans will be notified of the result of their application after bids are opened. The funds of the association are used for loans to members only. No bid will be entertained from any member in arrears for any payment, or who has not paid at least three monthly installments.  *  *  *

"REPAYING LOANS. Loans may be repaid at any time, on giving thirty days' notice. A borrower who repays his loan before maturity may continue his stock in force as an investment, or he may withdraw it, at his option. When a loan is repaid in less than seven years, an equitable rebate from the amount of premium will be allowed."

The bond and mortgage bear date September 28th, though the latter was acknowledged October 5th. A pass-book was furnished to the complainant, in the columns of which, headed as follows, the entries given below were subsequently made:

| Date. | Name of Collector. | Fines, Interest, etc. | Monthly Payments. |
|---|---|---|---|
| April 17, 1889 | Admission·fee | | $10 00 |
| 24 May | O. Watson | | 6 00 |
| 20 June | "        ? | | 6 00 |
| 17 July | " | | 6 00 |
| 17 August | " | | 6 00 |
| 17 September | " | | 6 00 |
| 30 October | " | | 6 00 |
| 18 November | " | $2.50 | 6 00 |

Similar entries to the last were regularly made monthly until December 17, 1895.

The defendant Hale was appointed receiver of the company on January 14, 1896, and complainant learned of it soon thereafter. He made no further payments. The complainant testified that at the time the mortgage was given he received $495, and that he has paid $675. The receiver filed an answer in the nature of a cross-bill, and asked an accounting and a decree of foreclosure.

About the only disputed question of fact is that relating to the printing in red upon the application for stock. There seems no doubt that the application was a blank furnished by the association, and there was testimony tending to prove that all blanks furnished by it had this red notice upon it. On the other hand, the complainant testified that it was not on the blank he signed. Counsel claim that the case is within the rule laid down in *Sawyer* v. *Building Ass'n*, 103 Mich. 228. It is said that he had a right to rely upon the statements of the agent to the effect that he could repay the loan in seven years by making monthly payments of $6, and could pay it in full at any time by paying the difference between the amount already paid, plus 6 per cent. interest thereon, and the amount actually borrowed; that he has paid more than the amount borrowed, with interest at 6 per cent.; and that it should be all applied upon the mortgage.

As we look at the case, the alleged fraud is not clearly

proved. The complainant was a lawyer. He knew he was getting stock, and presumably, at least, he could not have expected that he could get it for nothing. A local board was to be organized, and he had been furnished with some of the advertising matter of the association. Before he gave his mortgage he was put in possession of applications and other papers which described at length the scheme of doing business, and terms on which money could be borrowed and paid; and he made payments for several years, and until, according to the decree, he had overpaid by some $60 the amount due upon his bond. We think he was chargeable with notice that the amounts paid for monthly dues were payments upon stock. The notice upon his application for loan expressly said that "all that is required of the borrower is to pay the interest on the loan and the monthly payments on the stock." Furthermore, he made six payments, of $6 each, before he gave the mortgage, and should have understood they were payments upon stock, because they could be nothing else at that time. The stockholders in the association were not necessarily borrowers, and all, whether borrowers or not, had an interest in the profits of the company, and all were interested in the proper application of the sums paid in by the complainant. If the representations alleged were made and relied upon, the complainant owed it to other stockholders to demand a rescission of the contract as soon as practicable after ascertaining the truth, and, failing in that, he would be estopped from attacking the contract later.

Complainant received his certificate of stock, as already said, before he made his mortgage, which showed that the monthly payments were stock dues, and he paid them for several months before he gave his bond. It showed, also, that the greater part of the monthly payments would be credited to the general or expense fund, and not upon his loan. It also stated the terms on which a stockholder might withdraw or otherwise dispose of his stock, and it also stated that "no agent has authority to change this

contract in any way, and the association assumes no obligation for any statements not contained in its printed literature." Counsel for the complainant insist that he was unaware of the notice said to have been printed in red across the face of his application for stock, because it was not there when he saw it; but the tenth condition in the certificate of stock, above quoted, contains substantially the same. The bid also contains the conditions upon which loans were obtainable. Again, on February 5, 1894, a letter was written by the manager to complainant, apparently in answer to a request for a statement of the amount requisite to repay this loan; and a detailed statement was inclosed, from which it appears that the association then claimed $709.13 if the stock should not be canceled, and $342.88 if it should be. We are of the opinion that the complainant has not established his right to a rescission, and that he must be considered a stockholder in the concern, and his rights and liabilities must be measured and determined accordingly.

It is claimed on the part of the complainant that the contract is void because unconscionable and usurious. The latter claim is not new. It has been made many times, yet in the great majority of cases it is held that such contracts are not usurious. In some instances statutes authorize such contracts, especially exempting them from the effect of usury laws, while in others they are held not to be within the usury laws for different reasons. A long list of cases is cited in the defendant's brief which hold that these contracts are not usurious. We do not discuss them, however, because we are of the opinion that the statute settles the question for the purposes of this case. See *Tilley* v. *Loan Ass'n,* 52 Fed. 622; *Russell* v. *Pierce, ante,* 208.

It is claimed by the defendant that this is a Minnesota contract. If it is, the Minnesota statute covers it. The law under which this association was organized provides that "any premium for loans made by any association governed by this act [an act relative to building associa-

tions] shall not be considered or treated as interest, nor render such association amenable to the laws relating to usury." Stat. Minn. (1894) § 2879. Moreover, if it did not, we cannot take judicial notice that there is any usury law in Minnesota, and we are not advised of any proof upon the subject. Again, if, for any reason, the Michigan usury law (1 How. Stat. §§ 1594–1596) is applicable, the effect is only to preclude recovery of illegal interest; and no claim is made for such, as defendant asks credit only for the sum borrowed, with interest at 6 per cent.; admitting that the premium paid should be applied in reduction of the mortgage. Nor do we think the contract unconscionable. It is substantially like similar contracts made by building and loan associations throughout the country, and enforced by the courts every day. Building and loan associations are peculiar institutions, and, from some real or imaginary benefit that they are supposed to afford the poorer classes of society, are frequently given exceptional advantages over other corporations and private persons, such as immunity from taxation and usury laws. Their dealings are for the most part limited to contracts with their own members, all of whom participate in the profits, if any are made, and in losses, if any are suffered. If convinced that the managers of the association have, through fraudulent practices, embezzled, or, from poor management, squandered, its funds, we must not forget that the complainant is not the only sufferer, and that he has no right to preference over other stockholders, who have a community of interest with himself in the property and obligations of the concern.

It remains to ascertain the amount to be credited upon the mortgage. Complainant insists that he is entitled to have the amounts paid as stock dues applied to the mortgage, under the rule for partial payments; but this was held otherwise in the case of *Russell* v. *Pierce, supra.* To permit that would be to make the complainant a preferred creditor, to the disadvantage and injury of other stock-

holders. This right has been denïed in many cases and States, as shown by the following authorities cited by counsel: *State Sav. & Loan Ass'n* v. *Carroll*, 15 Pa. Co. Ct. R. 522; *Strohen* v. *Loan Ass'n*, 115 Pa. St. 273; *Wohlford* v. *Savings Ass'n*, 140 Ind. 662 (29 L. R. A. 177); *Eversmann* v. *Schmitt*, 53 Ohio St. 174 (53 Am. St. Rep. 632); *Towle* v. *Investment Society*, 61 Fed. 446; *Rogers* v. *Hargo*, 92 Tenn. 35; *Price* v. *Kendall*, 14 Tex. Civ. App. 26; *Post* v. *Loan Ass'n*, 97 Tenn. 408 (34 L. R. A. 201); *Rogers* v. *Rains*, 100 Ky. 295; *Knutson* v. *Building Ass'n*, 67 Minn. 201; *Southern Bldg. & Loan Ass'n* v. *Trust Co.*, 101 Ala. 582 (29 L. R. A. 120); *Pattison* v. *Loan Ass'n*, 63 Ga. 373; *People* v. *Lowe*, 117 N. Y. 175; *Mechanics' Bldg. & Loan Ass'n* v. *Conover*, 14 N. J. Eq. 219; Endlich, Bldg. Ass'ns (2d Ed.), § 477; 37 Cent. Law J. 43; *Curtis* v. *Provident Ass'n*, 69 Conn. 6 (61 Am. St. Rep. 17); *Goodrich* v. *Building Ass'n*, 54 Ga. 98; *Sullivan* v. *Stucky*, 86 Fed. 491; *Building & Loan Ass'n* v. *Price*, 169 U. S. 45; *Brown* v. *Archer*, 62 Mo. App. 277; *Weir* v. *Provident Ass'n*, 56 N. J. Eq. 234; *Moran* v. *Gray*, (N. J. Ch.) 38 Atl. 668; *Towle* v. *Loan Ass'n*, 75 Fed. 938; *Leahy* v. *Loan Ass'n*, 100 Wis. 555; *Hale* v. *Cairns*, (N. Dak.) 77 N. W. 1010. See, also, *Myers* v. *Building Ass'n*, 117 Mich. 389. Under the proofs, the complainant has paid interest to January 1, 1896, but nothing upon the principal. The decree of the circuit court is reversed, and a decree of foreclosure will be entered here, the amount thereof to be $500, with interest at 6 per cent. from January 1, 1896, to the date of such entry, with costs of both courts; the case to be remanded for further proceedings.

The other Justices concurred.