## NATIONAL MUTUAL BUILDING & LOAN ASSOCIATION OF NEW YORK v. BURCH.

1. BUILDING AND LOAN ASSOCIATIONS — FOREIGN CORPORATION— USURIOUS CONTRACT.

   2 Comp. Laws 1897, § 7584, which provides that the premiums, fines, and interest accruing to building and loan associations organized under our statute shall not be deemed usurious, does not aid the usurious contract of a foreign association which would be in violation of our laws if executed by an association in this State.

2. SAME—LOCUS OF CONTRACT.

   A loan made by a foreign building and loan association, secured by mortgage on property in this State, which, by its terms, provides for the payments to be made in the State of the association, yet which the parties understand will be paid to the local agent in Michigan, will be governed by the laws of this State as to interest.

3. SAME—OBJECTION TO JURISDICTION—APPEAL.

The right of a foreign building and loan association to enforce
a contract in the courts, it not having filed a copy of its
articles of incorporation, or paid a franchise fee, according to
2 Comp. Laws 1897, § 7592 *et seq.*, passed after the execution
of such contract, cannot be questioned on appeal, where the
record does not show any objection to the jurisdiction in the
court below, and the defendant does not appeal.

Appeal from Muskegon; Russell, J. Submitted February 8, 1900. Decided May 15, 1900.

. Bill by the National Mutual Building & Loan Association of New York against Albert H. Burch, Esther A. Burch, and Francis L. Thorpe to foreclose a mortgage. From a decree in its favor for less than the amount claimed to be due, complainant appeals. Affirmed.

*Charles S. Marr*, for complainant.

*Bunker & Carpenter*, for defendants.

MOORE, J. In July, 1898, complainant filed a bill for the purpose of foreclosing a mortgage given to it by the defendants Albert H. Burch and wife upon lands in Muskegon, Mich. The complainant claimed there was due upon the mortgage at the time the decree was made upwards of $1,000. The circuit judge granted a decree in favor of the complainant for the sum of $157.14, from which decree the complainant has brought the case here by appeal.

It is claimed upon the part of the defendants that the bond and mortgage are usurious, and that the circuit judge gave a decree for all that complainant is entitled to. Defendants did not appeal. It is claimed on the part of the complainant that the contract is a New York contract, governed by the New York law, and is not usurious. The complainant is a corporation organized under the laws of New York. It claims to be a building and loan associa'ion. Its articles of association provide that the principal office shall be in the city of New York. Section

2, art. 4, provides: "The board of directors may appoint a general advisory board and local advisory boards from among the shareholders at such places as they may deem best." The articles provide the capital of the association to be accumulated shall be $50,000,000. The shares are $100 each. Three kinds of shares may be issued, among them:

"Paid-up shares of the par value of $100 will be issued for $70 per share, upon which there will be paid to the holder semi-annually, from the earnings of the share, interest at the rate of six per cent. per annum upon the purchase price. Such shares shall be liable for no further dues or assessments, and will be payable at the maturity of, and in the same manner as, installment shares of the same date." Section 4, art. 8.

One person may hold 200 shares, enabling him to invest $14,000, upon which he shall receive 6 per cent. interest on the purchase price, and share in the profits the same as the installment shares. Another section provides:

"Interest at the rate of six per cent. per annum will be charged upon all loans, which interest must be paid monthly, with the monthly dues, on or before the last business day of each month, until the maturity of the pledged shares, and a premium of fifty cents per month will be charged on each one hundred dollars borrowed, which premium must be paid on or before the last business day of each month, for the period of eight years, or until the maturity of the pledged shares, should they mature before the expiration of the eight years. The premium for six months in advance will be deducted and retained from such loans." Section 2, art. 13.

The mortgage follows the terms of this provision.

Article 13 provides for loans upon the withdrawal value of shares upon the same rates for interest and premiums as charged in the case of loans upon real estate. It is then provided:

"The residue of the loan fund not required by shareholders may be invested in such securities as the laws of New York permit for investment of savings banks deposits." Article 14.

In 1890 the complainant appointed George W. Howell
its agent at Muskegon, "with full power and authority to
solicit and receive applications for shares of our associa-
tion in the said territory, and he is fully authorized and
empowered to collect and receipt for entrance fees on all
shares of the association so taken by him, but has no
authority to collect any other moneys of the association."
A local board was organized at Muskegon. Mr. Howell
was supplied with the literature of the company, and was
active in its interests. His testimony, in part, is:

"The association had a local board here. I organized
it. There was a president, vice-president, secretary, treas-
urer, and board of appraisers. The object of the local
board was to look after the interest of their business here
in Muskegon,—to do the local business of the association.
It did this up to the time when the local board was dis-
solved. This local board was in existence at the time this
mortgage was given by Mr. Burch, and for some time
afterwards; I have forgotten how long. I think the first
treasurer of the local board was W. R. Laughray. The
local treasurer gave a bond, and collected the money here."

Mr. Burch was the owner of a lot upon which there was
a mortgage of $400. He was interviewed by Mr. Howell,
and assured that, if he would become a member of the
association, he could obtain from it a loan of $1,000,
which would enable him to pay off the mortgage and
build a house upon his lot, and could obtain this money at
a cost of 6 per cent., and that all sums of money above
that amount paid by him would be applied upon the prin-
cipal of the loan. Mr. Burch says that, relying upon
these statements, and for the sole purpose of borrowing
the money to enable him to pay off the mortgage on his
lot and build a house thereon, he subscribed for 10 shares
of stock, and soon thereafter applied for a loan of $1,000.
Mr. Howell's version of the matter is not very different
from that of Mr. Burch. He undoubtedly believed the
statements he made to be true. The application for the
loan was accepted by the company, and for the purpose
of securing its payment Mr. Burch assigned to the com-

pany his shares of the stock as collateral security, and executed a mortgage on his land in Muskegon for $1,000. Mr. Howell took the application for the loan. The land was appraised by members of the local board, and the loan approved by the officers in New York city. The loan, according to the terms of the mortgage and the bond accompanying it, was payable at the office of the company in New York. After the loan was approved, a check for $582 and one for $18 were sent to the local attorney of the company at Muskegon. They were both indorsed by Mr. Burch, who was allowed to retain the one for $582. The $18 check was used by the company as six months' premium on the loan. Afterwards a check for $379.87 was given to Mr. Burch, the company retaining $11.13 as premium on the loan, and $9 as interest. These items made up the $1,000 for which the mortgage was given. The local attorney examined the title to the lands, and turned over the checks to Mr. Burch. The mortgage was delivered to the local attorney, put upon record, and sent to the complainant. Mr. Burch made payments to the treasurer of the local association. He paid, in all, the sum of $1,080.26. It is claimed by the association that the payments were applied as follows: For dues on the shares, $402; fines, $42; interest on loan, $318.13; premium on loan, $318.13. Mr. Burch was unable to keep up his payments. The association, in June, 1898, applied the withdrawal value of the shares, said by them to be $381.66, upon the mortgage, and filed this bill to foreclose it, claiming, as we have before stated, that more than $1,000 was due.

The first thing to be considered is, Was the contract in violation of our usury law? According to the articles of the association, and the terms of the mortgage also, Mr. Burch was to pay for this loan 6 per cent. interest, and as premium five dollars a month for eight years, or until the loan was all paid or the shares matured. If we eliminate the payment of dues upon the shares, it is apparent the mortgage calls for a payment for interest of upwards of

12 per cent. on the loan for a period of eight years, or until the pledged shares mature, and would be usurious, under our usury laws (section 4856, 2 Comp. Laws 1897), unless it is saved by the provisions of our laws governing building and loan associations (section 7584, Id. ). That section refers only to corporations organized under the act. The Michigan act also requires the directors to loan the surplus to the stockholder who shall bid the highest premium (section 7581); while it will be observed there is no such provision in the New York association, but, on the contrary, it requires a borrower to pay, in addition to 6 per cent. interest, a fixed premium on the sum borrowed. In this State such a contract could not be enforced by an association organized under our law. *Myers* v. *Building Ass'n*, 117 Mich. 389 (75 N. W. 944). Such a provision is contrary to the spirit and purpose of a building and loan association. See *McCauley* v. *Saving Ass'n*, 35 L.R. A. 244 (97 Tenn. 421, 37 S. W. 212, 56 Am. St. Rep. 813), and note, where there is a full collation of the authorities. The articles of association also provide for loans on shares at the withdrawal value thereof at the same rate of interest charged upon real loans. The directors are authorized to invest the residue of the loan fund in such securities as the laws of New York permit for the investment of savings banks deposits. Our statute applying to building and loan associations (section 7584, 2 Comp. Laws 1897) reads as follows:

"Corporations organized under this act being of the nature of coöperative associations, therefore no premium, fines, nor interest on such premiums that may accrue to the said corporation, according to the provisions of this act, shall be deemed usurious, and the same may be collected as other debts of like amount may be collected by law in this State."

Our law does not authorize the issuance of paid-up shares, thus allowing persons to make investments which shall bring them rates of interest much in excess of that allowed by our usury laws. We think it very clear that

a Michigan building and loan association could not do what was done here.

It is said the contract is a New York contract, and must be governed by the New York law, and for that reason can be enforced.   We do not think it at all clear this is a New York contract, or that it was so understood to be when it was made.   While by the terms of the mortgage the loan was to be paid in New York, it was expected the money would be paid to the treasurer of the local branch at Muskegon, and most of it was paid to him.

A case quite similar to this was passed upon in *Meroney* v. *Loan Ass'n*, 116 N. C. 882 (21 S. E. 924, 47 Am. St. Rep. 841), where the following language is used:

"Wharton, in his treatise on the Conflict of Laws (section 510), says of the question 'whether, when a mortgage is given as security for a loan, and the mortgage is in one State and the place of payment of the loan in another, the law of the former State or that of the latter State is to prevail in the settlement of interest,' that it has been frequently litigated in the United States, and 'with results which, on their face, are irreconilable.'   And the learned author says:

"'The true test is, Was the mortgage merely a collateral security, the money being employed in another State and under other laws, or was the money employed on the land for which the mortgage was given?   If the former be the case, then the law of the place where the money was actually used, and not that of the mortgage, applies.   If the latter, then the law of the place where the mortgage is situate must prevail.'

"It is stated in the elaborate brief of the learned counsel for appellant that the authorities cited by Wharton do not sustain the rule thus laid down by him.   Among these cases is *Chapman* v. *Robertson*, 6 Paige, 627 (31 Am. Dec. 264), in which it was adjudicated, as stated in the head-notes of that case in 31 Am. Dec. 264, that 'the construction and validity of personal contracts depend on the laws of the place where they were made, unless they were entered into with the view of being performed elsewhere;' and also that 'transfer of lands or other heritable property, and the creation of liens thereon, is governed by the laws of the place where such property is situate.'   Of this case

Folger, J., said in *Dickinson* v. *Edwards*, 77 N. Y. 573 (33 Am. Rep. 671):

" ' *Chapman* v. *Robertson* is a case often cited and relied upon, but it does not impugn the general rule that the validity of a purely personal contract is to be tried by the law of the place of its performance. The learned chancellor concedes that the case would have come clearly under that principle if the contract in suit had been only the personal contract of the defendant; but he holds that, as it was a mortgage actually executed here, by a resident here, upon lands here, for moneys loaned to be used here, though to be repaid elsewhere, the law of this State would fix the legality of the rate of interest reserved; and he further reasons that the contract was partly made here actually in reference to our laws, with an appeal to our courts contemplated by the parties, if necessary.'

"A distinction seems thus to be clearly recognized between a contract 'purely personal' (as, for instance, a promissory note executed in this State, but made payable *bona fide* in Georgia) and a contract not 'purely personal' (as, for instance, a loan of money by a citizen of Georgia to a resident here to be repaid in that State, and to be evidenced by note so payable, and mortgage on land in this jurisdiction).

"In *Jackson* v. *Mortgage Co.*, 88 Ga. 756 (15 S. E. 812), Bleckley, C. J., speaking of a loan of money made by the defendant to the plaintiff in New York, but secured by a mortgage on land in Georgia, where he resided, says:

" ' There was not one contract for making notes and another for securing them by a conveyance, but a part of one and the same contract was expressed in the notes, and a part in the deed executed at the same time. * * * There was no intention to make a loan without having it secured both by notes and a deed. It was, therefore, impossible to accomplish the object without calling in the law of Georgia as to a part of the transaction. New York had no law which could make any contract conveying land situated in Georgia operative or obligatory. As the law of Georgia would thus be essential with respect to a part of the transaction, that law, if possible, ought to be applied to the whole. There was no intention to make a mere personal contract, but the scheme was to make one partly personal, and partly confined by its very nature to a given situs, to wit, the State of Georgia.'

"See, also, *Martin* v. *Johnson*, 84 Ga. 481 (10 S. E. 1092, 8 L. R. A. 170), which was a suit to foreclose a

mortgage, the debt being payable in Massachusetts.    It is there said:

> " 'There is a portion of this contract which, under no circumstances, could be enforced in the State of Massachusetts,— that as to the land upon which it is sought to set up a lien.   Nor can we very readily see how any portion of this contract could be enforced in the State of Massachusetts against a person resident in the State of Georgia.'

"The difference in the contracts makes a difference in the rule applicable to their enforcement.    Hence, in *Pine* v. *Smith*, 11 Gray, 38, it was decided that a note made in Massachusetts, and secured by mortgage on land in that State, although payable in New York, was to be construed by the Massachusetts law; and in *Thompson* v. *Edwards*, 85 Ind. 414, it was held that if A., of Indiana, borrowed in Indiana, on notes secured by a mortgage on land there, money of a citizen of New York, some of the notes being payable in New York and some specifying no place of payment, the contract was an Indiana contract, and the question of its being usurious was to be tested by the law of that State.   In *Pancoast* v. *Insurance Co.*, 79 Ind. 172, the notes and mortgage were payable in Connecticut, and the court said:

> " 'It is true that the notes and mortgage are made payable at Hartford, in the State of Connecticut.   But it is true that they were executed in this State, the mortgagor lives in this State, the lands lie in this State, and from the terms of the mortgage it is clear that the intention of the parties was that the contract was to be enforced in this State.   The mortgage could be enforced nowhere else.   In such a case the law of this State governs, the rate of interest being fixed in accordance with the laws of this State.'

"The doctrine which Dr. Wharton announces seems to us just and reasonable.    It has been repeatedly held that such transactions would constitute 'doing business' in this State, so as to subject the foreign money lender thus conducting himself to a license tax.    Murfree, Foreign Corp. §§ 65, 69, and cases cited.    The contention of the defendant corporation seems to us to amount to this:    That it must be allowed to do business in North Carolina in total disregard of North Carolina's statutes and the decisions of her courts; that it shall be allowed to take mortgages on North Carolina land, from a resident owner, for money loaned to the resident, to be used here, and foreclose them

in North Carolina courts, where alone jurisdiction for foreclosure could reside, and where alone it must have contemplated enforcing its rights, if a resort to courts should be necessary, not by North Carolina statutes and the decisions of her courts, but by Georgia statutes and the decisions of its courts; in fine, that it shall be allowed to override, in the courts of this State, the laws of this State, and its well-settled policy as to the borrowing and lending of money. We cannot accede to this proposition, but, instead, we choose to adopt the doctrine announced by Wharton, quoted above, which seems to us more reasonable, and which he assures us is sustained by the authorities."

In *Freie* v. *Savings Union*, 166 Ill. 128 (46 N. E. 784, 57 Am. St. Rep. 123), the following language is used:

"But it is insisted that a foreign corporation organized as a building and loan association cannot contract for premiums and fines in addition to interest without violating the statutes against usury. The rule as to foreign corporations is that such a corporation created in another State may, upon the principle of comity, exercise within this State the powers conferred by its charter, if not inconsistent with the public laws or policy of this State. *Stevens* v. *Pratt*, 101 Ill. 206; *Santa Clara Female Academy* v. *Sullivan*, 116 Ill. 375 (6 N. E. 183, 56 Am. Rep. 776); *Barnes* v. *Suddard*, 117 Ill. 237 (7 N. E. 477). By the statute of Indiana, under which complainant was organized, it had power to enter into the contract in this case, and it was not contrary to the laws or policy of this State, which permit the organization of like corporations with the same powers."

To the same effect is *Rhodes* v. *Loan Co.*, 173 Ill. 621 (50 N. E. 998, 42 L. R. A. 93). See, also, *Lindsay* v. *Loan Ass'n*, 120 Ala. 156 (24 South. 171, 42 L. R. A. 783); *Interstate Sav. & Loan Ass'n* v. *Strine*, 58 Neb. 133 (78 N. W. 377); *National Mut. Bldg. & Loan Ass'n* v. *Keeney*, 57 Neb. 94 (77 N. W. 442); *Falls* v. *Building Co.*, 97 Ala. 417 (13 South. 25, 24 L. R. A. 174, 38 Am. St. Rep. 194); *Cotton States Bldg. Co.* v. *Reily*, (Tex. Civ. App.) 50 S. W. 961.

These cases are not in conflict with *Russell* v. *Pierce*, 121 Mich. 208 (80 N. W. 118), or *Phelps* v. *Loan Ass'n*,

121 Mich. 343 (80 N. W. 120).   It does not appear in either of those cases that what was done would be in violation of our law if done by a Michigan building and loan association.

In 1895 the legislature passed a law making it unlawful for a building and loan association organized outside of the State of Michigan to conduct or engage in business in this State without filing with the secretary of state a copy of its articles of incorporation, and paying at the same time a franchise fee. 2 Comp. Laws 1897, § 7592 *et seq.* The record discloses this company never complied with this provision of the law.   The question is now raised as to whether it can resort to our courts to enforce contracts, even though they were made before this law was enacted, —counsel citing *People's Mut. Ben. Soc.* v. *Lester*, 105 Mich. 716 (63 N. W. 977); *Equitable Loan & Investment Ass'n* v. *Peed*, 153 Ind. 697 (52 N. E. 201); *Seamans* v. *Temple Co.*, 105 Mich. 400 (63 N. W. 408, 28 L. R. A. 430, 55 Am. St. Rep. 457).   The record does not disclose that the jurisdiction of the court was questioned in the court below.   The defendants did not appeal from the decree. We decline to enter upon a discussion of that branch of the case.

The taxes of 1892 upon the mortgaged land were not paid.   The defendant Thorpe obtained a tax title thereon. The bill charges a conspiracy between Mr. Burch and Mr. Thorpe to allow this land to be sold for the purpose of cutting off the lien of the mortgage.   The circuit judge dismissed the bill as to Mr. Thorpe.   We think the conspiracy is not shown.

The decree of the court below is affirmed.

The other Justices concurred.