BECHTEL v. SAGINAW BUILDING & LOAN ASSOCIATION.

BUILDING AND LOAN ASSOCIATIONS—LOANS—COMPETITIVE BIDDING —USURY.

In order that building and loan associations may be entitled to the benefits of the statute that authorizes them to receive interest in the form of premiums on loans in excess of the rate allowed other lenders, they must comply strictly with the provisions of the statute in making the loans; and where it appears that the premium paid was not in fact based upon competitive bidding, as required by the statute, and that the borrower was induced by the association to believe that, in order to procure a loan, he must bid a certain premium, which was bid for him by the secretary, the contract will be deemed usurious.[1]

Appeal from Saginaw; Beach, J. Submitted November 9, 1905. (Docket No. 105.) Decided April 30, 1906.

Bill by Albert D. Bechtel and Sarah A. Bechtel against the Saginaw Building & Loan Association to restrain the

[1] As to usury in loans by building associations, see note to *Reeve* v. *Ladies' Building Ass'n* (Ark.), 18 L. R. A. 129.

foreclosure of a mortgage. From a decree for defendants, complainants appeal. Reversed, and decree entered for complainants.

*George C. Ryan* and *W. E. Crane*, for complainants.

*Nathan S. Wood* (*W. J. Lamson*, of counsel), for defendant.

MOORE, J. In December, 1894, the complainant, Sarah A. Bechtel, through the agency of her husband, borrowed from the defendant the sum of $2,400, and at the same time, to secure the payment of this money, she gave a bond and mortgage on her real estate, in which her husband joined. It is the claim of defendant that she also became, at the same time, a member of said association, and the owner of 24 shares of the twenty-seventh series of its capital stock. She made monthly payments to said association, until she had paid $2,564.50, and it is her claim that she then supposed she had paid nearly all she ought, and, desiring to pay the balance, attempted to find out how much it was; that she was then informed there was still due $2,389.96. Complainant claims that, after a computation was made at the rate of 6 per cent. on said bond and mortgage, and proper credits made for all payments made by her, there was due and unpaid on April 26, 1904, the sum of $933.23, at which time she tendered that amount to said defendant, who refused to receive the same, and threatened to foreclose the beforementioned mortgage for the full sum of $2,389.96. The bill is filed for the purpose of preventing the foreclosure, for an accounting, and for the redemption of the premises upon the payment of the amount due upon said mortgage. The defendant filed an answer in the nature of a cross-bill, praying for a foreclosure of said mortgage. From a decree finding the amount due to be $2,167.75, the complainant has brought the case here by appeal.

The husband of the complainant acted for her in procuring the loan and in making the subsequent payments.

It is the claim of complainant and of the husband that when he sought out the secretary of the defendant association and inquired of him if it loaned money, that he was told that it did, and that it loaned it at the legal rate, 6 per cent., and supposing that he was obtaining the money for his wife at that rate, it was borrowed and the payments were made in that expectation. It is the claim of both of the complainants they never understood they were paying any premium in addition to the legal rate of interest for the use of the money, and it is the claim of Mrs. Bechtel that she never understood that she was a shareholder in the defendant company. On the part of the defendant it is claimed the method of the company in doing its business was fully explained to Mr. Bechtel, that he knew just what he was doing, that he authorized the secretary of the company to bid 7 per cent. premium for the money, which amount was bid in an open meeting, and that there has been no action upon the part of the association which is not within the law, and that the decree ought to be affirmed. In our view of the case it will not be necessary to discuss all of the many interesting questions discussed by counsel.

The record shows that before the loan was obtained the following papers were made out:

"APPLICATION FOR ADVANCE.

"To the Board of Directors of the Saginaw Building and Loan Association of Saginaw, Mich.

"*Gentlemen:* At a regular meeting of your board, held December 26, 1894, I obtained a preference for an advance on 24 shares of the twenty-seventh series stock of your association, at a premium of seven cents per share per week. I now offer you as security therefor the following property, situated in Saginaw County, Mich., viz.: Lot 2, block 165, north of Cass street. Bought of H. B. Kinney on contract $5,000. There is now due on same $2,400 and six months' interest. Bought this loan to get the deed. My husband's full name is A. D. Bechtel. Occupation of my husband, furniture dealer. Should the loan be granted, I hereby agree to comply with the charter and by-laws of your association and all the requirements

as hereinafter defined by your committee or board of directors.

"ALBERT D. BECHTEL,
"Applicant for Sarah A. Bechtel.

"REPORT OF COMMITTEE.

"To the Board of Directors of the Saginaw Building and Loan Association of Saginaw, Mich.

"*Gentlemen:* Your committee to whom was referred the security offered by Sarah A. Bechtel for an advance of $2,400 on 24 shares of the twenty-seventh series of stock, bid by her December 26, 1894, at a premium of seven cents per week per share, they find the description is correct, and they consider it is sufficient as security for the advance applied for, provided 24 shares of twenty-seventh series stock be transferred by him to the association, and provided that insurance be effected to the amount of insurable value, running to the owner of said premises with loss, if any, payable to the Saginaw Building and Loan Association. Valuation, $4,500.

(Signed by the committee.)

"APPROVAL BY DIRECTORS.

"We, the undersigned directors of the Saginaw Building and Loan Association of Saginaw, hereby approve of the security offered by Sarah A. Bechtel for an advance of $2,400 on 24 shares twenty-seventh series stock, and the proper officers are hereby authorized, subject to the condition of the committee, and the report of the attorney, to close the same on the execution of necessary papers.

"Dated December 26, 1894."

(Signed by seven directors.)

It is conceded by defendant that it is upon this application, report, and approval, that the loan was made. It is the claim of Mr. Bechtel that he signed the application without reading it and at the request of the secretary upon his assurance that it was necessary, but that nothing was told him about a premium or a competitive bidding. The secretary contradicts Mr. Bechtel and says the latter knew he was bidding seven cents a share premium and authorized the secretary to make that bid for him.

At the time this transaction occurred the cases of *Myers* v. *Building Ass'n*, 117 Mich. 389, *National Mut. Build-*

*ing & Loan Ass'n* v. *Burch,* 124 Mich. 57, and *Dailey* v,
*Building & Loan Ass'n,* 133 Mich. 403, had not been
decided.

Section 7, art. 4, of the by-laws reads:

"The board of directors shall have power to fix the
minimum rate of premium at which the money on hand
shall be sold."

This by-law still exists, but, it is said, was treated as ob-
solete.

Among other statements of the secretary, in his testi-
mony in relation to Mr. Bechtel, was the following:

"As to the premium, it was explained to him, and he
was told that he had a right to bid, and he was told that
he.had a right to bid whatever premium he saw fit; that
the matter had to go before the board of directors; that
others were bidding seven cents premium, and if he wanted
to bid less it was his privilege.

" *Q.* In other words, state whether he was given to
understand that the matter of obtaining a loan from the
association was based on a plan of bidding for the loan? .

"*A.* It was based on the plan of bidding for the loan;
but in this case he saw fit to bid without going to the
board.   It was his privilege to go before the board if he
so desired.   I doubt if I explained to him that he might
bid under the gross premium plan, although I might have
done so, for at that time we were using the installment
plan altogether.   I told him it was necessary for him to
make application before we could get it before the board,
and he was ready to do so and made such application;
and he was asked what he would bid.   (Witness shown
Exhibit 1.)   That is the paper he signed as an application .
for the loan.   It is in my handwriting, except his signa-
ture.   After making the application I told him he had
the privilege to go before the board and make his bid if he
chose; if he made his bid in writing I could take it before
the board, and it wasn't necessary for him to go.   He said
'that was all right; I don't want to go.'   I made the appli-
cation, and they referred it to the proper committee; the
committee reported favorably, and the loan was granted.

" The first step at the directors' meeting is to call the
roll; the .second, reading the minutes of the previous
meeting; then the minutes are approved and the financial

statement showing the cash on hand subject to loan. This is read by me. This is done in an open meeting of the directors. Any one may come in at any time, and do so frequently. I found at this time there was money on hand to loan, and so informed the board. I immediately said there was so much money on hand which was for sale, and I bid for Mr. Bechtel and the others. He bid seven cents a week premium; was sold to him at that price. It was also sold to other bidders at the same price."

On the cross-examination he testified:

"*Q.* Now just tell the court when you took that bid in what you did with it?

"*A.* You shall have it. The only thing I was going to say is, that my practice is uniform, and every one is brought up in the same way.

"*Q.* I want you to tell just what you did when you took that loan of Mr. Bechtel's in before the board of directors.

"*A.* Then I stated to the board that Mr. Bechtel had authorized me to bid seven cents for him. I had talked the matter over with Mr. Bechtel first and got his consent to bid seven per cent. premium for him. I explained it to him in such a manner that he agreed to pay seven cents a week premium, which was to be paid the association. I then went before the board and said Mr. Bechtel had agreed to pay seven cents a week premium. There was sufficient money to advance each of the members, without the payment of any premium, if they had known the situation.

" *Q.* Why didn't they know the situation?

" *A.* They are not entitled to know how much money we have got to loan.

" *Q.* And you mean by that that you kept that from them?

" *A.* No, sir, I didn't convey it to them.

" *Q.* Just tell how they didn't happen to know that, Mr. Witt.

" *A.* How should they know it?

" *Q.* How should they know it? You kept that information from them?

" *A.* Yes, sir.

" *Q.* That is, you had money enough to make these loans at the time?

" *A.* Yes, sir.

" *Q.* And you wouldn't make that known to the members?

" *A.* I was not advised how many loans we had, or whether we had money enough for all. There was $3,-600 applied for that night. We had in the treasury $5,200. I made substantially the same explanation to each borrower at this meeting I did to Mr. Bechtel. None of them came before the board of directors. The general practice was for applicants to come, and their first question was, 'what interest do you charge?' And told that the interest was seven per cent. I myself advise them their premium.

" *Q.* Suppose that Mr. Bechtel had said that night—said to you outside the door, that he wouldn't give you that seven cents premium, what would you have done with that?

" *Mr. Lamson :* I object to that as incompetent and immaterial.

" *A.* I would have taken his bid in, whatever it was.

" *Q.* And yet at the same time, you have had a fixed premium every time, or the society had?

"*A.* There was such a matter on the records, but it was virtually understood that that was always left out entirely. The society always managed to get a fixed premium of 25 per cent. from all members who borrowed under the gross premium plan. The stockholders voted upon changing the plan in 1893. There was merely a resolution to the effect that the by-laws be changed so that money could be loaned on the installment premium plan. The members were all invited to be present at the meeting. That was before the complainant was a member of the society. Section 7 of article 6, which refers to the premium, was not stricken out of the by-laws when they were changed. This section authorizes the board of directors to fix the minimum premium for which the money on hand shall be sold.

" *Q.* This was the newly-adopted by-law, wasn't it, in 1895?

"*A.* In 1895. The book was read through. That was only an oversight that that article was not stricken out altogether.

" *Q.* Now I want you to describe, Mr. Witt, just what you did that night when you went before the board with Mr. Bechtel's loan?

"*A.* Well, as I said before, the first move of the meet-

ing was to call the roll of the directors, the second to read the minutes, and the third to have them approved. The fourth move was the reading of the financial statement, showing the amount of money on hand to be loaned out.

"*Q.* Did you read the applicants for loans at that meeting?

"*A.* Then I stated the money was for sale, and that I was authorized to bid so and so for whoever made the application.

"*Q.* That is what they authorized you to bid?

"*A.* Yes, sir. That was true.

"*Q.* And then you had the money put up at auction?

"*A.* That is true. The money was put up at auction in that way.

"*Q.* And you bid it off for the members?

"*A.* Yes, sir.

"*Q.* And the members paid seven cents a week premium?

"*A.* Yes, sir.

"*Q.* And you made it just as clear for them as you possibly could?

"*A.* I certainly did.

"*Q.* Those members that went in there consented to give the premium voluntarily to the society?

"*A.* They certainly did. If they had wanted a smaller premium they should have bid. They wanted a smaller premium, perhaps, but they wanted the money.

"*Q.* Why didn't they bid a smaller premium?

"*A.* I don't know. As I say, the person wanting the money usually says: 'Well, I suppose I have got to pay as much as any one, and you may as well put that in.'

"*Q.* So Mr. Bechtel and all those members that went in there, they all authorized you to bid that seven cents?

"*A.* Yes, sir.

"*Q.* And all the money was put up at auction? Who auctioneered it off?

"*A.* Well, there was no regular auctioneer, like you would go on the street and sell goods for me, or anything of that kind; but the statement was made that the money was open for sale.

"*Q.* And who made that statement?

"*A.* I did.

"*Q.* You made the statement yourself?

"*A.* Yes; and after that I stated that each member in his order had bid so much money."

It is claimed the secretary acted at the request of Mr. Bechtel as the agent of Mrs. Bechtel in making the bid, offering a premium of seven cents a share.   It should not be forgotten that the parties were not dealing upon an equal footing.   *Sawyer* v. *Building Ass'n,* 103 Mich. 228.   Mr. Bechtel was negotiating for a loan that both parties knew was to be used to enable his wife to pay off a mortgage upon her home.   Mr. Bechtel was not familiar with the complex methods of the association. See *McCauley* v. *Saving Ass'n,* 97 Tenn. 421 (35 L. R. A. 244).   The secretary was familiar with the affairs of the association.   He knew there was more money to loan than there were applicants for.   He withheld this important fact from his principal.   He was the paid secretary of the defendant.   We express no opinion as to whether this was such a dual relation as to prevent his acting for the applicant, but if he was to act for him he should give him all such information as would enable him to act intelligently.   We have not quoted all of the testimony of the secretary and none of that given by the president of the association, but it is impossible to read it without reaching the conclusion that the result of the statements made to applicants was to give them to understand that in order to get a loan they must bid a premium of seven cents a share.   In this connection the language used by Justice Gill is in point:

" 'The directors of the corporation shall hold stated meetings, at which such sums of money as they may determine shall be offered for loan to all the members in open meeting.   The shareholder who shall bid the highest for the preference, or priority of loan, shall be entitled to receive a loan whose amount shall not exceed the number of shares of stock held by such shareholder multiplied by the par value thereof.'   1 Rev. Stat. 1889, § 2812.

" It will be noticed that this privilege of borrowing the accumulated funds of the association is confined to the shareholders, and to them in proportion to the par value of stock held by each; also that the stockholder has the right to get the loan for a small or even nominal premium, provided of course that no other member overbid him at

the open meeting held by the directors. This exclusive privilege belongs to the shareholders by virtue of, and in proportion to, their respective stock subscription. If in letting the money out, the officers or directors shall in any way take from the shareholders this privilege of attending the open meetings and securing loans for the least amount of premium they are able to get it in competition only with other members, and shall fix an arbitrary rate or premium below which the borrowing shareholders cannot obtain the money, then clearly the statute above quoted is violated and the premium not fixed 'according to the provisions of this article.' In order to bring the transaction within the protection of the statute and exempt it from the charge of usury, the premium must be fixed by free and open competition between the borrowing shareholders, and not by an arbitrary rule of the officers or directors of the association. *Brown* v. *Archer*, 62 Mo. App. 291; Endlich on Building Ass'ns (2d Ed.), § 409, and authorities cited in the text.

"As tersely expressed by the last-named author:

"'A premium in order to be lawful, must be one bid for the right of precedence in taking a loan, at a competitive sale of such rights; and where there was no such sale and no bid, there can be no lawful premium. In other words, where it was simply agreed between a borrower and an association that he was to have a loan at a certain premium, not the result of any competitive sale, but of mere consent between the parties, the loan was held usurious. The so-called premium was in fact a part of the price named by the lender to be paid by the borrower for the use of the money loaned. The assent of the borrower to pay the price required did not make him a bidder within the meaning of the statute. Calling the excess above the highest legal rate a premium did not change the nature of the transaction. It was usurious. * * *

"'It follows,' says the same author [§ 411], 'as a necessary consequence of the illegality of the attempt to establish and enforce any provision as to a fixed minimum premium, that contracts made under the stress of the operation of such a rule, and affected by it to the prejudice of the borrower, are usurious and cannot be enforced according to their terms.'

"When we bring now the facts of the case at bar alongside the principles of law above stated, the illegality of the so-called premiums which plaintiff agreed to, and did in part pay for the loan in question, is made clear. First of all the evidence shows that about two years prior

to the loan to plaintiff, defendant adopted a rule or by-law that 'no money should be loaned for a less premium than 40 cents per month on each $100.' A few days before this loan was effected plaintiff negotiated with defendant's secretary and manager as to the cost thereof; and it was there in effect agreed that in addition to $3.00 monthly dues on plaintiff's stock the rate of interest proper should be six per cent. with the monthly payment of a premium of 40 cents on the $100 loaned or $2.40 monthly premium on the $600. The secretary told the plaintiff that he need not attend the directors' meeting and that he (the secretary) would 'bid off' the proposed loan for plaintiff at the price agreed and fixed by the by-law. The evidence clearly shows that competitive bidding was not contemplated, and that there was a definite understanding between the borrower and the secretary that the former was to get the loan at the fixed rate of 6 per cent. per annum as interest and $2.40 monthly premium on the said $600. Plaintiff did not appear at the directors' meeting, and the secretary then and there went through the empty form of having the $600 loan auctioned off, and he, pretending to act for the plaintiff, made the only bid for the preference, to wit, 40 cents on the $100 which, as already stated, was the minimum premium fixed by defendant's by-law. It is the merest trifling to contend that the plaintiff secured this loan in a competitive bidding. The so-called auction of the loan was a mere pretense." *Moore* v. *Building & Loan Ass'n,* 74 Mo. App. 468.

We think the course pursued by the defendant association was an evasion of the statute and resulted in a usurious contract under *Myers* v. *Building Ass'n, National Mut. Bldg. & Loan Ass'n* v. *Burch,* and *Dailey* v. *Building & Loan Ass'n,* supra. The learned trial judge thought he was not at liberty to follow the case of *Moore* v. *Building & Loan Ass'n,* supra, because of what was said in *Estey* v. *Building & Loan Ass'n,* 131 Mich. 503. In that case the contract was held to be usurious and we do not think anything was decided in that case which is in the way of holding this contract to be in violation of the law. Associations of this character are not entitled to the benefits and immunities conferred

upon them by the statute, without complying with its provisions.

The decree of the court below is reversed, and one may be entered here finding the amount to be due April 26, 1904, to be $933.23. Complainant will recover costs of both courts.

McAlvay, Montgomery, Ostrander, and Hooker, JJ., concurred.