JOHN F. CURTIS vs. GRANITE STATE PROVIDENT ASSOCIATION.

First Judicial District, Hartford, January Term, 1897.  ANDREWS, C. J., TORRANCE, FENN, BALDWIN AND HAMERSLEY, JS.

The insolvency of a building and loan association and the appointment of a receiver to wind up its affairs, works a practical dissolution of the association and terminates to a certain extent its contracts with its members. Under such circumstances the mortgage indebtedness of its borrowing members becomes immediately due and collectible by the receiver, regardless of the fact that it is in terms payable in instalments extending over a definite period of time.

The receiver, however, is not entitled to collect the cash premiums or bonus, accruing after his appointment, which the borrower promised to pay monthly for the privilege of realizing at once the ultimate par value of his shares. The consideration for such promise is the ability of the association to fulfill its part of an entire mutual contract, and this consideration fails when the association ceases to be "a going concern." And, for the same reason, all such premiums paid prior to the receiver's appointment should be applied in reduction of the actual mortgage indebtedness of the borrower.

Dues paid by members, as such, on their respective shares of stock, ought

not to be credited back to them as debtors, since this might give them an inequitable advantage over non-borrowing members in the distribution of the assets of the association.

[Argued January 7th—decided March 3d, 1897.]

PETITION by a receiver, for instructions brought to the Superior Court in Hartford County and reserved by that court, *George W. Wheeler, J.,* for the consideration and advice of this court.

. The case is sufficiently stated in the opinion.

*Sidney E. Clarke,* for the petitioner.

*Charles A. Safford,* for two of the respondents.

TORRANCE, J. This is a petition by the receiver in the cause above named, for instructions relating to certain questions arising in the performance of his duties. The Superior Court found the facts stated in the petition to be "true, sufficient, and material," and reserved the case for the advice of this court.

The material facts alleged may be summarized as follows : The Granite State Provident Association is a New Hampshire corporation, which began business on the plan of a building and loan association in the spring of 1888. It consists of about eighteen thousand members. Of this number about seventeen hundred are borrowers, while the remainder are not borrowers ; and these two classes are termed " borrowers " and " investors " respectively. About sixty members of the association, residents of this State, have borrowed money of the association and given mortgages on real estate here to secure the same. By its charter the association carried on business solely on the mutual plan. " Each person becoming a member subscribed for and took one or more shares, and there was delivered to him a certificate of stock representing the number of shares owned by him. The nominal par value of each share was two hundred dollars. Such a member paid one dollar a month to the association, or twelve dollars a year. Such payments, solely on shares,

were termed dues. As a penalty for not making his monthly payments or dues, he was liable to a fine. It was estimated that at the end of eight years, from such payments, fines, and all other kinds of investments and profits, the association could pay back to each investor two hundred dollars for each share, and deliver up to each borrower any mortgage held by the association against him. Any one desiring to borrow money of the association must first become a member, or an investor, and must subscribe for a number of shares whose aggregate par value would be equal to the face of the second mortgage. The member gave a first and second mortgage for his loan. The first mortgage was for such an amount as would readily facilitate its sale by the association to third parties; nearly all of which mortgages in this State have been sold in this way. The association indorsed the notes and is held liable on the same at this time. The first mortgage might comprehend the whole amount loaned, providing the security was good enough to warrant it. The member at the same time he gave his note also gave a second mortgage on the premises to the association, which the association always held. In this second mortgage the borrower agreed to pay a certain amount each month on each share held by him, until his shares should each be worth two hundred dollars, when his mortgage would be delivered to him and canceled. He also agreed to pay all insurance and taxes on the property mortgaged, and to assign his shares to the association as additional security. · In this second mortgage the association agreed to pay the note secured by the first mortgage, according to its tenor, and to deliver said first mortgage, properly canceled of record, to the borrower. The first mortgage note usually ran five years. Many of said notes, however, in the State of Connecticut, are demand notes. In making these loans to members, one of two plans was adopted. One was called the gross premium plan, and the other was called the cash premium plan. The loans made in Connecticut were on the cash premium plan. On this plan a certain amount of money was advanced to the borrower as a loan, upon his taking the requisite number of

shares, upon which he paid a certain amount each month as interest on the whole loan, a certain amount each month as premium, and a certain amount each month as dues on his shares. For example : if a member was advanced the amount of eight hundred dollars, he pays four dollars dues, monthly, on four shares, which are assigned as additional security for the loan ; four dollars per month, which is interest at six per cent per annum, on the amount actually advanced; and usually two dollars per month, which is called the cash premium, which is three per cent per annum on the amount actually advanced. The borrower received eight hundred dollars in cash, and paid a total of ten dollars per month on his loan. He has paid the dues on his shares like all investors. In addition to this, he has paid six per cent interest on the money actually advanced to him, and three per cent interest on the amount advanced as a cash premium."

On March 18th, 1896, upon the petition of the bank commissioners of the State of New Hampshire, the association was enjoined from doing any more business, an assignee was appointed in that State, and its business and affairs are now being wound up there.

On May 29th, 1896, the petitioner was duly appointed receiver of the association in and for the State of Connecticut, and is now acting as such.

Since his appointment no dues have been paid to him from any of the members, but a small number of the borrowers here have made payments to him equal to the interest and premium on the amount of the loan. A large number of the borrowers here have made no payments to him whatever, and he has been obliged in several instances to pay interest to the holders of the first mortgages, "for the purpose of retaining the interest of the association in the second mortgage held by the contracts of the association." The mortgages taken by the association on real estate here are now in the petitioner's hands as part of its assets.

The petitioner prayed for instructions "in the performance of his duties as such receiver, upon the following questions arising upon the facts hereinbefore set forth: (1) Do all

mortgages held by the association against its members become due by the appointment of the receiver, regardless of the times or terms of payment set forth in the same; and are the mortgages held by your petitioner in the State of Connecticut due because of this appointment, and regardless of the times or terms of payment set forth therein? (2) Can the receiver collect of the borrower any more than the amount actually advanced, or, in other words, can the cash premium. be collected? (3) Should the cash premium paid previous to March 18th, 1896, be applied on the amount actually advanced, or be retained according to the tenor of the contract, to that date?"

The first question is perhaps broad enough in its scope to include matters the decision of which might affect the rights of persons who were not made parties to this proceeding, but. if so we must limit it to matters affecting the rights only of such as are parties. Limited in this way the question, in effect, is whether the mortgages held by the receiver upon real estate here, can now be enforced by him for the purpose of collecting the assets and winding up the affairs of the association here; and we are of opinion that this must be answered in the affirmative.

So far as the second mortgages are concerned they provide that upon a certain contingency—the non-payment of dues—which has happened, the mortgages may, at the option of the mortgagee, its successors or assigns, at once be foreclosed. But we do not rest our answer to this first question upon any provision of this kind, nor upon any breach of the mortgage condition in either the second or the first mortgage; we rest it on the broad ground that the association has been in effect and for all practical purposes prematurely dissolved.

It is now well settled that upon the premature dissolution of an association of this kind, or upon its becoming insolvent and unable to carry out the purposes for which it was created, and passing into the hands of a receiver for the purpose of having its affairs wound up—which is, in practical effect and operation, a dissolution—the borrowing members may be compelled to pay forthwith the balances due from them

on their securities, although the latter in terms only provide for payment by instalments extending over a definite period of time.    *Windsor* v. *Bandel*, 40 Md. 172, 177 ; *Waverly Mut., etc., Asso. of Baltimore County* v. *Buck*, 64 id. 338, 347 ; *Low Street Bldg. Asso.* v. *Zucker*, 48 id. 448 ; *Hoboken Bldg. Asso.* v. *Martin*, 13 N. J. Eq. 427 ; *Strohen* v. *Franklin Saving and Loan Asso.*, 115 Pa. St. 273 ; *Buist* v. *Bryan*, 44 S. Car. 121; *Towle* v. *Amer. Bldg. Loan & Inv. Soc.*, 61 Fed. Rep. 446 ; Endlich on Bldg. Asso. (2d ed.), § 523.

The facts in this case clearly show that so far as the present members of the association are concerned, whether borrowers or investors, the association is to all intents and purposes practically dissolved and defunct; and that its existing contracts with the Connecticut borrowers, as expressed in these mortgages, or otherwise, can no longer be carried out.    The case, therefore, comes within the established rule in such cases, and the mortgages can now be enforced in the process of winding up.

The second question is whether the receiver can collect the cash premiums, accruing under the terms of the mortgage, after the association went into the hands of an assignee; and we are of opinion that this must be answered in the negative.

The loans in this State were all made on the cash premium plan; that is, the borrower paid each month, in addition to the interest on the money borrowed and the amount due upon his shares, a further sum in cash, called a cash premium, in the nature of a bonus.    The agreement of the borrower in an association of this kind, to pay dues, interest, and premium, is made upon the implied condition that the association shall remain " a going concern."    The premium is, in effect, a bonus charged to a member wishing to borrow, for the privilege of anticipating the ultimate value of his stock, by obtaining the immediate use of the money his stock will be worth at the end of the period contemplated by the parties to the transaction.    Endlich on Bldg. Asso. (2d ed.), § 399.    When an association, before that time, becomes insolvent and goes into the hands of an assignee or receiver for

12 MARCH, 1897.

Curtis v. Granite State Provident Association. Vol. 69

the purpose of winding up and putting an end to it and its business, it can no longer perform its part of the mutual agreement, the borrower is deprived of the privileges for which he agreed to pay the premium, and so the consideration for that agreement entirely fails. Under such circumstances the promise to pay premiums ought to be regarded as no longer binding, and so are the authorities. *Cook* v. *Kent,* 105 Mass. 246 ; Endlich on Bldg. Asso. (2d ed.), § 523 *et. seq.* See also the cases hereinbefore cited. In the case at bar the receiver is not entitled to collect premiums accruing after the association went into the hands of the New Hampshire assignee.

The last question is in form limited to the application of the premiums paid prior to the appointment of the New Hampshire assignee, but in his brief the receiver treats the question as if it related to the application of dues as well as premiums, paid before that time, and we will consider the question as if it embraced both dues and premiums.

With reference to the premiums, the question is whether they shall be applied in favor of the borrower in reduction of the mortgage indebtedness, or whether they shall belong to the association as was contemplated in the agreement. If the association had lived to fulfill the purposes contemplated by the parties to these mortgages when they were made, there is no doubt that the premiums would have belonged to the company, and would not and could not have been applied in reduction of the mortgage debt; but upon the practical dissolution of the association, the weight of reason and of authority leads to the conclusion that no part of the premium should belong to the company, but should be applied in reduction of the debt, because the consideration for the promise to pay premiums utterly fails. " Upon the basis of all the decisions examined, it may be safely laid down that the clear weight of authority rejects the enforcement of any part of the premium. And in reason and fairness this must be so. The premium is not a payment in advance. The contract concerning it is that it shall be made up by the borrower in the association's hands, and that, upon his final settlement

with the association, when the work of both shall be accomplished and their reciprocal duties fulfilled, it shall be relinquished to and appropriated by the association. The contract, therefore, is an entire one. It does not contemplate a stoppage at any intermediate point and an apportionment of the premium accordingly. No part of it is earned until the whole scheme has been carried out. . . . Hence, if at any stage, the society, breaking down, fails to perform its part of the bargain, the promise to pay it the premium loses the consideration upon which it was based, and ought to be regarded as wholly abrogated. To attempt to apportion the premium is simply to treat it as additional interest. To regard it as something with which the borrower has parted, as something which the society has earned, as assets in its hands before it has done that which entitles it to retain the premium,—is to misconceive its true character and office." Endlich on Bldg. Asso. (2d. ed.), § 531. See also the authorities hereinbefore cited under the other points in the case.

Treating the premiums in the case at bar, then, just as the parties in the case do, as premiums in the proper legal sense, and not mere payments of interest under the name and guise of premiums, we are of opinion that the premiums paid prior to the appointment of the New Hampshire assignee, are to be applied in favor of the borrowers as payments upon the money actually advanced to them.

With reference to the dues paid upon the shares prior to the appointment of the assignee, we are of opinion that they should not be applied in reduction of the amount actually advanced to the borrower. The Connecticut mortgagors stand in a double relation to the association: they are members—investors—as well as borrowers. As members they are bound to contribute to the losses and expenses of the common enterprise. If the amount of dues paid in by them as members is credited back to them as debtors, they will receive in full the amount paid upon stock, while the other members who have not become borrowers may receive only a small percentage of the amount paid in by them. "The insolvency of a company, as before observed, puts an end to

its operations as a building association; to a certain extent, it also ends the contract between it and its members respectively, and nothing remains but to wind it up in such a manner as to do equity to creditors, and between the members themselves.   As regards the latter, care should be taken to adjust the burdens equally, and not to throw either upon borrowers or non-borrowers more than their respective share. That result may be reached by requiring the borrower to repay what he actually received with interest.   He would then be entitled, after the debts of the corporation are paid, to a *pro rata* dividend with the non-borrower for what he has paid upon his stock.   He will thus be obliged to bear his proper share of the losses."   *Strohen* v. *Franklin Sav. and Loan Asso., Towle* v. *Amer., Bldg. Loan & Inv. Soc., supra;* Endlich on Bldg. Asso. (2d ed.), § 523; *Rogers* v. *Hargo,* 92 Tenn. 35; *Goodrich* v. *City Loan, etc., of Augusta,* 54 Ga. 98. The cases upon this last point are not in harmony, some of them holding a doctrine contrary to that announced in the authorities last above cited; see case of *Buist* v. *Bryan, supra,* and authorities therein cited (51 Amer. St. Rep. 787), and the extended note in 69 Amer. Dec. par. 6, p. 162 *et seq.*   But we think the former is the sounder rule of the two, and should be adopted in the present case as it is presented upon this record.

The Superior Court is advised:—

(1) That the mortgages in the hands of the receiver are now enforceable as against members of the Association. (2) That premiums, after the assignment in March, 1896, cannot be collected.   (3) That premiums paid prior to the appointment of the receiver should be treated as payments upon the sum due under the mortgage; and that dues so paid should not be so treated, but, so far as the mortgages are concerned, should be treated as if paid by non-borrowing members. ·

In this opinion the other judges concurred.