People's Building and Loan Association *v.* Joseph Mc-
Philamy, and People's Building and Loan Asso-
ciation *v.* Louise Hawks.

| 81 | 61 |
|----|-----|
| 82 | 435 |

| 81 | 61 |
|----|-----|
| f90 | 715 |

1. Building and Loan Associations. *Usury.* *Code* 1892, § 2348.
   The usury laws, code 1892, § 2348, have no application to a true
   building and loan association, domiciled in this state and dealing
   only with its members.

2. Same. *Liquidation. Accounting. Solvency. Insolvency.*
   When the affairs of a building and loan association are to be
   liquidated the equitable principles which control an accounting
   are the same, whether the association be solvent or insolvent.

3. Same. *Borrowing members. Dues.*
   In settling the affairs of a true building and loan association the
   borrowing members are not entitled to be credited with sums paid
   by them as dues on their stock in the association.

4. Same. *Dual capacity.*
   The borrowing members of a true building and loan association
   occupy a dual relation; in their capacity as borrowers they are
   debtors to the association, and in their capacity as stockholders
   they are members of it.

5. Same. *Payment of stock dues. Interest.*
   What a borrowing member of a true building and loan association
   pays as stock dues he pays in his capacity of stockholder and
   what he pays as interest he pays in his character as debtor.

6. Same. *Insolvency. Borrowers not released.*
   The insolvency of a true building and loan association does not re-
   lease a borrowing member, who remains as before liable to his
   just proportion of losses and expenses.

7. Same. *Borrower must pay loan. Lump sum. Assumed risk.*
   A borrowing member of a true building and loan association, upon
   its insolvency or liquidation, must pay up his loan, less credits to
   which he may be entitled, not in installments as he could have
   done had the association remained solvent and a going concern,

but at once in a lump sum, with legal interest, this being one of the risks assumed by becoming a member of the association.

8. SAME.   *Executory part of contract abrogated.*

The insolvency, or liquidation for any cause of the affairs, of a true building and loan association, in the absence of special contract enlarging the effect of failure to remain a going concern, abrogates its contracts only so far as they are executory.

9. SAME.   *Borrower's obligations as stockholders.*

The obligation of a borrowing member of a true building and loan association, after insolvency of the association, in his capacity as stockholder is the payment of his just pro rata of the expenses and losses, including receiver's commissions, court costs, etc.

10. SAME.   *Borrower's credits for stock.*

Upon settlement between an insolvent true building and loan association and a borrowing member, before the close of the administration of the affairs of the association, he is entitled to be credited, if the same can be then ascertained, with the ultimate value of his shares of stock; if the same cannot be then accurately ascertained he may, in the discretion of the court, be credited on account of his stock with a sum which surely will not exceed its ultimate value; if the value of his stock be so difficult of ascertainment that he cannot be safely credited with any sum therefor, he must pay his debt with interest and await the close of the administration of the association's affairs to receive the value of his stock.

11. SAME.   *Procedure.   Suits not administrative.*

Borrowing members of a true building and loan association which has become insolvent or whose affairs are being liquidated cannot increase their rights against, or diminish their liability to the association by bringing suits against it which are not administrative; the equities by which the rights of the parties are determined are not affected by modes of procedure.

FROM the chancery court of Lauderdale county.

HON. STONE DEAVOURS, Chancellor.

McPhilamy and Hawks, the respective appellees, were complainants in separate suits in the court below, the building and loan association, appellant in both cases, was defendant there in both cases.   Appellees were borrowing members of the People's Building and Loan Association.   The association went

into voluntary liquidation, and was about to foreclose the mortgages that the appellees had given it to secure their loans, when they filed the bills in these cases in the chancery court to enjoin the sale of the property under the mortgages, and claimed in their bills that their debts had been more than paid, and prayed for an accounting. The association filed its answers, and joined in the prayers for accountings. The court below held the contracts as abrogated *ab initio,* ordered accounts to be stated, and appointed a commissioner to state them. The commissioner stated these accounts, and, on the accounts as stated by the commissioner, personal decrees were rendered in the court below for considerable sums, respectively, in favor of complainants. The court ordered complainants to be charged by the commissioner in stating the accounts with the sums actually borrowed, with six per centum interest per annum, the legal rate in the absence of a contract rate, although the debts as evidenced by promissory notes bore ten per centum, and directed that they be credited with all sums paid by them, according to the rule for the application of partial payments prescribed by § 2351 of the code of 1892. From the decrees against it the building and loan association appealed to the supreme court.

*S. B. Watts, McWillie & Thompson,* and *Alexander & Alexander,* for appellant.

1. Complainants cannot in equity complain of the voluntary liquidation, *unless they show that it would operate, or might operate, to their prejudice.* While the financial scheme of these associations is in some respects unique, yet there is no such magic about them as to take them out of the category of ordinary corporations or to relieve its stockholders of the ordinary rights and obligations of stockholders. "The rights of the members are governed by the usual principles of corporation law." 4 Am. & Eng. Ency. L., 1034.

There is no law which compels a building and loan associa-

tion to continue in business, if it is unprofitable. It is well settled that a majority of the stockholders of any business corporation doing an unprofitable business may make a sale of its assets. *Berry* v. *Broach,* 65 Miss., 450. It can be shown beyond a doubt that the plan which was selected, and was being carried out, was greatly to the advantage of borrowing members, and since each of these is a suit by only one member, we will show that the plan was especially beneficial to each of the complainants. It must be borne in mind that the payments which the borrowers were to make during liquidation were to continue just as before. It is, therefore, obvious that in order to show injury or prejudice to them they must show that such monthly payments would continue longer under the new plan than under the former plan. The one concern of a borrowing member, therefore, is to pay out as speedily as possible. Every loss prolongs the period of his monthly payments, and profits correspondingly shorten it. When these members obtained their loans and entered into their contracts the nature and limit of their rights were fixed by their respective contracts. If the plan of the association in existence when they negotiated their loans would, if judicially carried out, mature their stock and thus cancel their mortgages within a certain time, then we submit that the utmost limit of their right was that the association should not voluntarily adopt any course that would lengthen that period. Now, when the stockholders proposed a plan of liquidation that did not increase the payments to be made and stipulated to be made in the contract by the borrower, the only inquiry open to borrowing members was whether this would *postpone the time of their discharge.* If it did not, surely they could not be heard to complain. Courts are open for the redress of wrongs. A suit is called a complaint. Suiters in chancery are called complainants. They must *complain* of some *wrong,* and the courts will not concern themselves with speculative inquiry as to what would be the rights of parties under supposed circumstances. If the particular act com-

plained of benefited the complainant and gave him more than he was entitled to under his contract, he cannot complain. It is well said in *Shrimpton* v. *Warmack,* 72 Miss., 208, that if a party more than fulfilled his contract the other party cannot complain.

It can easily be demonstrated by the most exact of all sciences—arithmetic—that complainants were benefited by the settlement instead of injured. In September, 1898, the association credited McPhilamy with the then value of his stock, which was $480, representing a total payment of about $400. The balance then found due was $715.18. Now, under the association's plan, payments were not credited at the time they were made, and of course did not operate to stop interest, but the stockholders agreed that the same payments should continue, and the same rate of interest should continue, but with the favor to the borrower of giving him interest on his payment by applying the credit when made. If we take $715.18, the amount due in September, 1898, and calculate interest at ten per cent. for each month and credit each month's payment of $23, it will be found that McPhilamy's debt and mortgage would be canceled March 1, 1901. From March, 1893, the date of the loan to March, 1901, is eight years which is one year less than the minimum of time in which stock could possibly be matured under the association's plan, and many years less than it would ever be matured but for the liquidation. We challenge an examination of these results, and we ask how in reason McPhilamy can be heard to complain of this settlement. The same reasoning and figuring applies to Mrs. Hawks' case.

2. The decree is erroneous because it allows credit for the stock payments. The Am. & Eng. Ency. Law, vol. 4, p. 1081, notes three different views which had up to that time been taken by the courts as to the relative rights of the investing and borrowing stockholders on liquidation. It places foremost the view that all payments, whether stock payments, premiums, or

interest, shall be credited on liquidation, the borrower only being charged with the amount of the loan and interest.

We submit that this view, which was the one acted on by the chancellor, is not supported by the cases cited in support of it, will not bear the light of reason, and is in the last degree inequitable and unfair to investing members. The Encyclopedia, vol. 4, was printed in 1897. Even at that time, and in the light of the decisions then published, the discussion of this sub-topic showed superficial research by the author. The citations in support of the first view did not sustain it, and the citations in support of the other two views might have been, even at that time, very greatly multiplied.

Let us briefly examine the several decisions cited in support of the first view: *Brownlie* v. *Russell*, L. R., 4 App., 235, which is a decision of the House of Lords was a construction of the right of the borrower growing out of the *wording of the contract*. A rule of the association gave the borrower the right of withdrawal at any time "upon paying the whole debt, interest, and penalty, after deducting the amount of monthly installments paid upon his share, with interest thereon calculated at the rate referred to in the rule." The opinion admits the great advantage to the borrowing member, but, while conceding that it is hard on the investing members, says: "It was the bargain." So this case is not an authority for the general rule.

*City Loan Ass'n* v. *Goodrich*, 48 Ga., 445, is the next case cited. We fail to understand how it can be thought an authority in support of the view. In that case even the borrowers who enjoined a plan of liquidation did not claim to be exempt from further assessment for losses, but offered a plan which taxed *themselves* a certain amount to *equalize the distribution*. Besides, it was not shown in that case that there had been any loss, and the court assumed throughout that there were profits. The inaccuracy of the author in citing Georgia as a state supporting the first view is inexplicable, for in the same article, vol. 7, p. 1035, a later Georgia decision—viz., *Pattison* v. *Al-*

*bany B. & L. Ass'n,* 63 Ga., 375—is cited in support of the rule that "each member of a building association, whether borrower or non-borrower, participates in the earnings and must assist therefore in bearing its losses."

The next case cited in support of the first view is *Waverly Mut., etc., B. & L. Ass'n* v. *Buck,* 64 Md., and several earlier Maryland cases. In that case the court proceeded on the express postulate that the contract was in its inception usurious.

In *Windsor v. Applegate,* 40 Md., 172, the court expressly declined to announce a general rule, but said: "We have no difficulty in fixing the rule *in the present case,*" and the reason given was because "it appears from the proof there have been no losses and no debts."

In *Lister* v. *Log Cabin B. & L. Ass'n,* 38 Md., 115, the court said: "The advanced or prepaid members have not ceased to be members by the prepayment, but continue to hold an interest in the management and success of the association, as upon that depends their earlier relief." This Maryland case was relied on by a borrower in *Wohlford* v. *Citizens' B. & L. Ass'n,* 140 Ind., 672, but the court reviewed it and held that it was an authority for the view that the borrower could not be allowed credit for his stock payment.

The next case cited in support of the first view is *Cook* v. *Kent,* 105 Mass., 246. However, it was decided on the language of the contract and the provisions of the by-laws. The contract was that the borrower "ceased to be a member" upon obtaining his loan, and the decision was based upon that provision of the contract that he was to pay dues "until the payment of *dues* amounted to the principal sum of the loan." So it will be seen that here was a definite contract that the installments were not paid on stock, the borrower having ceased to be a stockholder, but were to be applied direct in discharge of the principal of the loan. We have thus shown that the only three courts in this country and the one court in England cited in support of the text base their decisions on features not

found in this case, or where they do discuss such features, they support the view of the appellant.

A careful search of all the authorities since the publication of the encyclopedia, including the advance sheets of the various reports, disclosed only one other case which could properly be cited in support of the first view. That case is *Hale* v. *Barker*, 129 Cal., 419. The decision is based on the assumption that there had been no loss. The bill was filed by the receiver of the association and the burden was on him. The opinion states that the officers were examined as witnesses and gave no information as to any loss. How different from this case, where it is shown that the association has had to take $28,000 of real estate, and has had to mark it down in value and still could not sell it, to say nothing of other losses apparent in the record. Indeed, all the assets except this depreciated real estate consist of loans, and if, instead of borrowers owing the association, the association owed each one, as it is claimed it does owe these complainants, then the association has no assets at all, for the supposed assets are converted into liabilities. We submit that the California decision is at utter variance with the later decisions in that state. In *McNamara* v. *Oakland Ass'n*, 131 Cal., 336, the court says that in equity only the ascertained value of the pledged shares are to be credited, and in *Homeseekers' Ass'n* v. *Gleeson*, 133 Cal., 312, the court holds that the borrower is not entitled to offset stock dues unless the value of the stock can be definitely ascertained. It is true this latter case was not, so far as it appears, a case of insolvency, but we do not see how insolvency can change the equity in this respect.

It is singular that the author of the article in the encyclopedia should place foremost the view that stock payments should credited, thus implying that it is the prevailing view, when Mr. Thompson, in his Com. on Corp., vol. 7, sec. 8796, shows clearly that the view is incorrect; that the borrower, in any event, can only get credit for the actual value of his shares, and that an accounting must be had as to "receipts, losses and profits,

available assets on hand, etc." Endlich on B. & L. Ass'ns takes the same view as Thompson. See 2 vol., secs. 511-514.

In support of the second view, even at the time of the publication of that volume, many more cases could have been cited. Since then all the courts, with the one exception noted above, so far as we can find, have fallen into line with those that hold that stock payments cannot be credited, unless there has been complete liquidation and the value of the stock is definitely known. We call especial attention of the court to several of these cases. One is *Hale* v. *Kline,* 113 Ia., 523, which holds that borrowers are not entitled to offset stock dues unless the value of the shares can be definitely ascertained. The opinion cites very many cases. *Young* v. *B. & L. Ass'n,* 48 W. Va., is perhaps the best recent review of all the authorities and textbooks, and we call especial attention to its reasoning. See, also, *People* v. *Lowe,* 117 N. Y., 175; *Wohlford* v. *Citizens' B. & L. Ass'n,* 140 Ind., 672; *Everman* v. *Schmidt,* 53 Ohio St., 174. It is passing strange that the encyclopedia did not cite this last case. In note to 69 Am. Dec., 155, it is stated that the only exception to the rule that the borrower must share in the losses is when by borrowing he ceased to be a member (p. 155, top), citing in support of this an early Massachusetts case. That state, as we have seen, holds that the borrower wholly ceased to be a member, and, furthermore, the contract in the case cited was that the dues were to be applied in liquidation of the principal sum. We cite, also, in support of our view, *Farmers' Sav. B. & L. Ass'n* v. *Ferguson,* 69 Ark., 352.

Even if the question were an original one to be solved without the aid of authorities, the view taken by the chancellor will not bear the test of reason. It is inequitable in the last degree.

3. Most of the authorities hold that on liquidation the amounts paid as premium should be credited on the debt. We submit that the premium is not directly related to the loan, but to the stock, and that, therefore, it should be treated as the stock dues. In any event it is inequitable to credit these pay-

ments as of the time they were made, since, as we have shown above, it works out a great inequality. They were paid to make a loan fund and to enhance the value of the stock, and the borrower did not expect any present credit on his debt for the payment. It can easily be demonstrated that if every borrower gets credit even for the interest paid and premiums as of the time the payments were made, there will not be assets enough to pay them.

4. As we have stated above, there are some authorities which hold, where the value of the stock has been definitely ascertained, the court which is liquidating the entire assets will not require the borrower to first pay in any amount and then receive it back as dividend on his stock. But even if this view should be adopted, the rule cannot be applied in this case. These appellees brought these suits. They have the burden of proof. They ask affirmative relief and undertake to show the credits they are entitled to, and they affirmatively show that this stock, on the basis of settlement they contend for, is worthless. Nor does it lie with them to say that all the parties interested in the association are not before the court, and that, therefore, the principles applicable to a general liquidation are not involved in this suit. They come into a court of equity and ask specific, as well as general, relief, and the facts developed by them show that they are not equitably entitled against the association (which is only the aggregate of the stockholders) to the relief they obtained. If they have not made all the stockholders parties, or have not taken proper proceedings to have the equity of all parties adjudged, they alone are to blame. It is well settled that a defendant cannot by cross-bill bring in new parties, nor can a defendant in chancery compel the complainant to join parties. The court, however, can say that it will not proceed with the case without proper parties, or can, if the proper parties are not before the court, refuse to grant relief, where to do so is an injustice, or where the equitable principles invoked by complainants do not entitle him to relief.

*Amis & Dunn* and *S. A. Witherspoon,* for appellees.

The question for determination here is the proper and equitable basis on which to state the account between the parties. As preliminary to this, however, it is necessary to determine the relative rights, duties, and obligations of the parties, subsequent to, and in view of, the action of the association on September 19, 1898, and January 31, 1899, and its consequent failure to carry out the original building and loan scheme. Touching this matter, there are four different views, either of which the court might adopt, to-wit: 1st. That appellees, because of their membership, are bound in *toto* by the action of the association on the dates named, and hence that the account should be stated as then outlined by it.    2d. On the idea of a mutual performance of the contract, *pro tanto,* and a subsequent mutual abandonment thereof, that appellees are bound by the action of the association on the dates named, so far only as the same affected past dealings of the parties, and hence that the account should be stated as outlined by the association, except that appellees should be charged only six per cent interest after September, 1898.    3d. That appellees are not at all bound by the action of the association on the dates named, but, on the idea that there were two contracts between the parties, to-wit: a loan contract and a stock contract, only one of which, the loan contract, has been breached by the association, then that appellees are still members of the association as stockholders, but because of the breach of the loan contract they should be treated as ordinary debtors *ab initio;* hence that the account should be stated by crediting the dues to the stock account, and all other sums to the loan account, according to the rule for partial payments, allowing each contract to stand on its own basis, separate and distinct.    4th. That appellees are not at all bound by the action of the association on the dates named, and on the idea that there was only one contract between the parties (the stock contract and the loan contract being merely parts of a complete whole), then that a breach of a part is a

breach of the whole contract; hence, that appellees should be credited, *ab initio,* with all sums paid by them, whether of dues, interest, or premiums, according to the rule for partial payments.

Our objection to the first and second method of accounting is that appellees are not bound by the action of the association in September, 1898, and January, 1899. The contention of appellant, that the courts have no power to manage the affairs of corporations or mutual associations, otherwise than in the way in which a majority of the stockholders, in the absence of fraud, see proper to give direction thereto, is unsound as applied to the facts of these cases. We contend that when a corporation so acts as to affect the rights of others, when it seeks to evade or break its contracts with other persons, and by its own enactment to create and enforce a new scheme of dealing, the courts will interfere to adjust the rights of the parties. In this case the contract between the parties was that the loan should be repaid by "the accumulation of a fund by the issuance of certificates of stock to be paid for in installments, interest on loans, and premiums," which fund, when grown large enough, should cancel and pay the loan—not in part, but in *toto.* Now, it cannot be seriously contended that one of the parties to this contract can legally or rightfully vary or alter its terms by requiring a different method of payment without the express consent of the other. To attempt to do so is not only nugatory, but is of itself a breach of the contract. The obligations of the contract are as binding on the one party as the other, and both are equally bound to its performance as originally made.

Appellant contends that the scheme adopted by the association was a mere plan of liquidation, and that the very right to be a corporation involves the power to liquidate its affairs; and because the method adopted by the association is fair and just to all the members it should not be disturbed. Let us grant the first proposition; still we deny the second. It will be remembered that up to September, 1898, one of appellees had paid

into the common fund of the association $1,152.40 by way of interest and premium on his loan, and the further sum of $402 as dues on his stock, and that the value assigned to his six shares of stock at that time was only $484.80, and that of the total sum of $1,152.40 paid by him by way of interest and premium, he had at that time received credit on his stock account for the pitiful sum of $82.80. Now, what had become of the remainder of this $1,152.40? According to the testimony of the secretary, it had gone to swell the profits of all other stockholders in the association, borrowers and non-borrowers alike, according to the amount invested in stock by each. Now, in a serial association, such as the appellant here, there are new members coming in and old members going out constantly. The members that had retired their stock prior to September, 1898, had carried with them their pro rata share of appellee's interest and premium payments. They are beyond the reach of the association, and the funds withdrawn by them can never again be bought into hotch potch in the common fund. The remainder of said appellee's interest and premium payments had gone to swell the profits of other members, borrowers, and non-borrowers, who were still in the association. Now, said appellee, and all other borrowing members, had agreed to pay interest and premiums on their loans, on the understanding that the original scheme should be carried out to the end—in other words, that they should be able to recoup their earlier losses with later profits. So, when it became apparent that it was necessary for the association to go into premature voluntary liquidation, is it fair, is it just, is it equitable, to visit *all the losses upon the borrowing members* and none upon the others? Is it fair to take the *premiums* paid by them and pay *all expenses and losses,* and then distribute the surplus thereof, a part to the borrowers and a part to the *non-borrowers?* Take the schedule of assets and liabilities filed by the secretary showing the book value of each share of stock in the association in September, 1898, and it will be seen that every share of stock in

the association, borrowing and non-borrowing, was worth more, as shown by the books, than had been paid in as dues on that stock. Now, where had this profit come from? From the interest and premiums paid by the borrowers. Where, then, had all the losses and expenses fallen? Upon the borrowers, and no one else. This, presuming the affairs of the association to have been honestly managed, is what became of said appellee's $1,152.40 interest and premiums paid by him.

True, the non-borrowing members might have legally demanded the pound of flesh, as named in the bond, if the scheme had carried to the end, but inasmuch as it did not, this court will, we apprehend, see that justice is done to the borrower as well as the non-borrower. But, aside from all this, appellant seems to forget that the question lying at the very root of all this controversy is one of contract; and it matters not, we insist, whether the scheme proposed by appellant be more or less beneficial to appellee than the original contract, this court will not enforce it unless it accords with the rules of law governing such matters, and this it does not do.

Our objection to the third method of accounting, above outlined, is that there was only one contract between the parties; that the "stock" contract and the "loan" contract are merely parts of one complete whole, both being created simultaneously and each being necessary concomitants the one to the other; hence, that a breach of a part is a breach of the whole, and regulates the parties to their rights under the law, freed from the stipulations of the contract. Our reason for this is that both the "loan" contract and the "stock" contract, regarding them as separate entities or as one complete whole, are, so long as they exist at all, always *in fieri*—executory, in other words. Because the instant the "stock" contract becomes executed, it ceases to be a "stock" contract and becomes a simple debt, for which the corporation can be sued at law, while with the loan contract, the instant it becomes executed, it ceases to exist.

If this were an administration suit, if all the members of

association were before the court so that it could protect and adjust the rights and equities of all parties, and thus guarantee and enforce the liquidation of the association, we think that the third method of accounting stated by us would be eminently just and equitable to all concerned. By requiring all dues to be credited to stock, borrowing and non-borrowing alike, and allowing the borrowing members credit upon their loans for all other sums paid by them, according to the rule for partial payments counting interest at the legal rate of six per cent. and thus apportioning all the losses and expenses to the stock of the association pro rata, would work out even-handed justice to all concerned, whether they were borrowers or non-borrowers. But this is not an administration suit. There is no receiver here. There are but two parties in each of these cases before the court—viz., the building and loan association in its corporate capacity on the one side, and Joseph McPhilamy and Louise Hawks, respectively, one of the borrowing members, on the other. The court is, therefore, without power to direct or control the liquidation of the affairs of the appellant. If it should order that appellee, McPhilamy, be allowed to offset all sums paid by him, except the sum of $402 dues paid on stock prior to September, 1898, and that his stock remain in full force and effect, to abide the final liquidation of the affairs of the association, there would be no guaranty that they would ever be liquidated. The court would not be stating the whole account between the parties, but only a part of it. It would not be doing complete equity, but only a part. It would still leave said appellee in the hands of those who think it eminently fair and just for him, and his kind, to bear all the losses and expenses, while they bear none. We, therefore, insist that the only thing that this court can do is to enforce the rule of the common law as to breach of contract, on the maxim that "equity follows the law," and thus affirm the decision of the lower court. As to the proper method of accounting in suits other than in administration suits on breach of contracts see the following: *City B. &*

*L. Ass'n* v. *Goodrich,* 48 Ga., 445; *B. & L. Ass'n* v. *Buck,* 64 Md., 338; *B. & L. Ass'n* v. *Braden* (Tex. Civ. App.), 32 S. W., 704. The following cases refer to the application of dues and premium in cases where the building and loan contract is vitiated because of usury; *Ass'n* v. *Jaecksch,* 57 Md., 198; *Bank & Whitmore,* 25 App. Div. (N. Y.), 491; *Strauss* v. *Ass'n,* 117 N. C., 308 (s.c., 118 N. C., 556); *Buist* v. *Bryan,* 44 S. C., 121; *Rhodes* v. *Ass'n,* 173 Ill., 621; *Simpson* v. *B. & L. Ass'n,* 41 S. W., 570; (s.c., 42 S. W., 834); *Price* v. *B. & L. Ass'n,* 41 S. W., 574; *B. & L. Ass'n* v. *Taylor,* 41 Md., 409; *Williar* v. *B. & L. Ass'n,* 45 Md., 546; *Mills* v. *B. & L. Ass'n,* 75 N. C., 292; *B. & L. Ass'n* v. *Griffin,* 90 Tex., 480; *Sokoloski* v. *B. & L. Ass'n,* 77 Miss., 155; *Crofton* v. *B. & L. Ass'n,* 77 Miss., 166; *B. & L. Ass'n* v. *Tony,* 78 Miss., 916; *Shannon* v. *B. & L. Ass'n,* 78 Miss., 955.

In the foregoing cases it has been uniformly held by the courts that in cases of usury the statutory penalty imposed upon the lender vitiated the contract so far as its building and loan features were concerned, and changed the relation between the parties to that of simple debtor and creditor, *ab inito.* That, therefore, the borrower was entitled to credit for everything paid by him, according to the rule for partial payments, whether as dues, interest, or premiums. This court having adopted that view in the cases above cited will, we apprehend, apply the same rule here. All the cases holding to the third method of accounting stated by us, are, so far as we have been able to find, cases in which the court was administering the affairs of the association through its receiver.

Argued orally by *C. H. Alexander* and *R. H. Thompson,* for appellant, and by *A. B. Amis* and *S. A. Witherspoon,* for appellees.

WHITFIELD, C. J., delivered the opinion of the court.

These cases will be considered and determined together, as

they are one, so far as the method of accounting is concerned. This is a true building and loan association, and it is a domestic building and loan association, and hence no question of usury is involved. It had been operating for some years, and, finding that its business ceased to be profitable, it went into voluntary liquidation in September, 1898. We are inclined to think that the association is insolvent, but whether so or not is not material in considering the method of accounting. The equitable principle of accounting must be the same whether the association be solvent or insolvent. The question for consideration in these cases is, therefore, where an insolvent association goes into voluntary liquidation prematurely, what is the proper method of accounting between the borrowing and non-borrowing members, respectively, on the one hand, and the association, on the other. And the precise question here, more particularly is, should a borrowing member be credited on his debt with the amount of dues he has paid in on his stock? A borrowing member of a building and loan association occupies a dual relation to the association. In his capacity as borrower, he is a debtor. In his capacity as shareholder, he is a member of the corporation. What he pays as interest is paid in his character as debtor on his loan. What he pays as stock dues is paid in his character as stockholder. The two are separate and distinct, and must be so dealt with. *Hundermark* v. *Loan Ass'n* (Miss.), 29 South., 528. When a building and loan association becomes insolvent, there is nothing to do but wind up its affairs. The shareholder who has been a member remains a member, liable to his just proportion of losses and expenses. He suffers a hardship in this: that, instead of having his payments on his loan distributed in small installments over many years, he is compelled by the necessity of the situation, and the nature of the building and loan association, to pay up his loan in one lump sum, with legal interest. This often involves great injustice to him, but it is, nevertheless, one of the risks which he assumed in becoming a member of this mutual asso-

ciation. There are instances where, because of peculiarly framed contract stipulations, a shareholder may cease to be a member upon insolvency or premature liquidation, but we speak of the ordinary membership, with the usual incidents in a building and loan association, such as we have before us in these cases. It is thoroughly settled by the authorities that when such insolvency ensues, or such premature liquidation occurs, the contract between the borrower and the association is abrogated; but there is diversity of opinion as to the point of time from which it is to be abrogated. Some of the earlier authorities held that, since the association cannot do for a borrower what it contracted to do, the contract is abrogated in such case *ab initio,* and the simple relation of debtor and creditor between the borrower and the association established from the beginning, and that all payments made by the borrower, under whatever name— whether interest, premium, fines, stock dues, or what not— shall be credited upon the loan, and only the balance, with legal interest, collected from the borrower. In other words, the non-borrower would in such case sustain the whole burden of the loss incurred up to the time of such insolvency. This ignores the fact that the borrower was a member of the association up to the time of insolvency; had proceeded all along upon that basis, bearing his proportionate part of expenses and losses up to the time of such insolvency—bearing them as his part of losses and expenses, under that name. Close analysis makes it plain that this is not just to the non-borrower, for under this method the borrowing member would get back, entire, all his stock dues, without abatement of a single cent, whereas the non-borrower would only get back such portion of his stock dues paid in as would result from the winding up of the affairs of the association—less than the whole in every case of insolvency. The true doctrine undoubtedly is that the contracts are to be abrogated for the future—that is to say, so far as they are executory—but that, prior to insolvency, they shall stand. In

other words, up to insolvency the payments must stand in the character they had when made; for example, stock dues as payments made by the member in his capacity as member; but after insolvency the borrower's obligation to pay stock dues, etc., shall cease, because the consideration for such payments fails from that time forward. Merely because the association becomes insolvent, what he has theretofore paid as his allotted part of expenses and losses has not by some occult process changed its character, and become interest or principal paid on the debt. He remains a member after insolvency, even, charged, just as the non-borrowing member with the duties and obligations of a member, until the final settlement of the affairs of the association, which obligations consist, however, after insolvency, in simply paying his just pro rata of expenses and losses; expenses including, of course, such things as receiver's commissions, court costs, etc. He will be entitled when such settlement is made to have whatever his share of stock proves ultimately to be worth then credited to his loan. More than this, if there can be a reasonably certain estimate of what his shares are worth prior to the final settlement—such an estimate as will surely not exceed their value—the court may, in cases like these, credit such estimated value as payment on the debt. Whether such value of the shares shall be estimated and credited in advance of the settlement, or only at the settlement, must be determined by the chancery court in its sound discretion. The earlier cases to which we referred, holding that stock dues are to be credited on the debt, and that the contract is to be abrogated from the beginning, and the borrower treated as a mere debtor from the beginning, are as follows: *Association* v. *Goodrich,* 48 Ga., 445; *Association* v. *Buck;* 64 Md., 338; 1 Atl., 561; *Cook* v. *Kent,* 105 Mass., 246; *Buist* v. *Bryan,* 44 S. C., 121; 21 S. E., 537; 29 L. R. A., 127; 51 Am. St. Rep., 787; and various other authorities. See, also, 4 Am. & Ency. Law (2d ed.), 1081, and note; 7 Thomp. Corp., p. 7359, note 63. Add to this the late case of *Hale* v. *Barker,*

129 Cal., 419; 62 Pac., 168. See, also, *Carpenter* v. *Richardson,* 101 Tenn., 176; 46 S. W., 452. We are inclined to think that the California case of *Hale* v. *Barker* is not in accord with later cases decided in that state, as pointed out by counsel for appellant. We refer to it, however, as the best-reasoned case on that side. We think a careful consideration of the recent and best-considered cases shows that this early doctrine is being departed from, as the nature of building and loan contracts becomes better understood, and the practical operation of such associations, under their contracts, more fully disclosed. The true doctrine must be that set forth by Judge Thompson, in his work on Corporations (vol. 7., sec. 8796), as follows: "The effect upon the borrowing members of a premature dissolution, or what practically amounts to the same thing, requires some notice. In return for the undertakings of the borrower in the transaction of loan or advancement, as they have been pointed out, there is an implied undertaking on the part of the association that the borrower shall have the advantage of the building association scheme in the liquidation of the whole of his indebtedness—*i. e.,* that it shall be by means of gradual payment, and that he shall participate, and have the opportunity of reducing his liability by his participation, in the profits of a continuing business, to be carried on to a fixed end. Where, through bad management, financial misfortune, loss of membership, or any other cause the career of the association is brought to a premature close, the borrower is compellable forthwith to pay the balance due from him on his security, although, in terms, only given for installments. He is, therefore, deprived of some proportion of the advantages, the prospects of which induced him to assume the burden of his original obligation. There remains nothing to compensate him for his liability to make up the premium, to keep up stock payments, to pay fines, etc. The consideration of the liability failing, the liability itself must, in a proportionate degree, fail also. In other words, there remains on the one side a claim; on the other,

a liability to be measured simply by the amount of money actually advanced. In such case, therefore, all the borrower can be held for, on the theory of a rescission of at least part of his contract, and remitting the parties, as to the rest, to the position of the ordinary lender and the borrower, is the amount received by him from the association, with legal interest. Upon this point nearly all the authorities agree. Some of them also declare the borrower to be entitled to a reduction from this amount of all periodical payments of dues and interest paid by him. In others it is declared that the borrower shall be required to pay back what he has actually received, with interest, and without deduction on account of any stock payments, and that he will then be entitled, after the debts of the association have been paid, to a pro rata dividend, alike with the nonborrowing stockholders, upon what he has paid into the association as dues. When it is remembered that the borrower still rests under the membership liability to contribute toward the losses and expenses of the association, it is clear that the former of these methods cannot be correct; for by it he will escape some part of his share of the losses. But, on the other hand, the hardship and increased expense of settlement which may result from requiring the borrower to pay back all that he has received, without any credit for the dues he had paid in, remitting him to final distribution for a return of the excess of his payment over what shall be found justly due from him, would seem to indicate the propriety of a third method, wherever practicable— viz., to ascertain what the receipts, profits, and losses of the society have been, what its liabilities are, what available assets are on hand, and what, accordingly, is the present real value of every share, making allowance for the expenses of settlement; to credit the amount on the borrower's debt in respect to each share held by him, and charging him with the sum actually advanced to him and interest, reduced by part payments of interest and premium, collect from him only the balance." See, also, End. Bldg. Ass'ns, sec. 477, and an elaborate note in 5

Am. & Eng. Dec. Eq., to *Williams* v. *Maxwell,* at p. 254, par.
2, where the same doctrine is very clearly and fully stated,
with a full citation of authorities.   The editor says: "Since
the cessation of the business of the building association puts
an end to the contract between it and its borrowing members,
and makes their loans due and payable at once, it converts the
relation between them into that of mere debtor and creditor,
and consequently should entitle the borrower to have the dues
paid credited upon the loan, if no equities supervene.   Accord-
ingly this rule is generally acknowledged to prevail in cases of
a voluntary dissolution or cessation of business (*Association* v.
*Goodrich,* 48 Ga., 445; *Association v. Buck,* 64 Md., 338; 1
Atl., 561; *Association* v. *Braden* [Tex. Civ. App.], 32 S. W.,
704), and has in a few instances been held to apply to the
winding up of an insolvent association, when the contract of loan
was usurious (*Association* v. *Jaecksch,* 51 Md., 198; *Bank* v.
*Whitmore,* 25 App. Div., 491; 49 N. Y. Supp., 862; *Strauss*
v. *Association,* 118 N. C., 556; 24 S. E., 116; *Buist* v. *Bryan,*
44 S. C., 121; 21 S. E., 537; 29 L. R. A., 127; 51 Am. St.
Rep., 787).   But inasmuch as this doctrine enables the bor-
rower to evade his liability to share in the losses of the associa-
tion, it can only be upheld on the theory that he is not a mem-
ber thereof; and, whenever he is to be regarded as such, he can
not claim credit for dues paid, in case of the insolvency of the
association, but must pay up the whole debt, and share in the
assets pro rata with the other members (*Sullivan* v. *Stucky*
[C. C.], 86 Fed., 491; *Curtis* v. *Association,* 69 Conn., 6; 36
Atl., 1023; 61 Am. St. Rep., 17; *Browne* v. *Archer,* 62 Mo.
App. 277; *Weir* v. *Association,* 56 N. J. Eq., 234; 38 Atl.,
643; *Strohen* v. *Association,* 115 Pa., 273; 8 Atl., 843; *Asso-
ciation* v. *Carroll,* 15 Pa. Co. Ct. R., 522; *Id.,* 4 Pa. Dist. R.,
6; *Lepore* v. *Association,* 5 Pa. Sup. Ct., 276; affirming *As-
sociation* v. *Lepore,* 17 Pa. Co. Ct. R., 426; *Rogers* v. *Hargo,*
92 Tenn., 35; 20 S. W., 430),  .  .  .  .  unless the actual
loss and expense of winding up are capable of calculation, in

which case it is preferable practice to permit him to pay the balance between the actual value of his stock and the loan, or, as it has been otherwise expressed, the difference between the dues paid in and the loan, plus his pro rata share of the defalcation of the association (*Reddick* v. *Association* [Ky.], 49 S. W., 1075; *Williams* v. *Maxwell,* 123 N. C., 586; 31 S. E., 821; 5 Am. & Eng. Dec. Eq., p. 224)."

We select two other opinions for their marked ability in setting forth this view. They are the opinions of Sherwin, J., in *Hale* v. *Kline,* 113, Ia., 526; 85 N. W., 814, and the opinion of Brannon, J., in *Young* v. *Association,* 48 W. Va., at p. 514; 28 S. E., 670; this last being the finest opinion we have seen on the subject. In the former, Justice Sherwin says: "The only question presented for our determination in this case is whether the defendants are entitled to credit for any part of the dues paid on the twelve shares of stock issued to A. D. Kline, and assigned by him as collateral security for the loan and premium in question. At the outset of the discussion of this question, we should say that the association was purely a mutual one, that every stockholder was a member thereof, and that every member thereof was a stockholder. Except as to the liability incurred by borrowing money of the association, every member assumed the same liabilities, and was entitled to a proportionate share of its earnings, from whatever source derived. With this mutuality of interest and liability in view, what are the rights of the defendants, and the rights of the other members and creditors, as represented by the plaintiff? There were two classes of members, which we designate as borrowers and non-borrowers. To become a borrower, it was necessary to offer a premium of so much per share on the shares held by the applicant. The premium which these defendants contracted to pay was $600, represented by one-half the amount for which they gave their note. If the association had continued as a going concern until the monthly dues paid on the twelve shares of stock had matured, the stock then, by the

2c

terms of the note itself, a surrender of the stock could have been made in full payment of the money actually received, and of the premium represented in the note; and in such case the defendants would, of course, receive indirectly the amount paid in dues. But the association became insolvent before the maturity of the stock, and it is obvious that the rights and equities of the members are thereby placed upon a different footing. This changed condition has been held by some courts to operate as a rescission of the entire contract, and to leave the members to an equitable adjustment of their rights and liabilities. It is conceded by all or most of the courts, however, that the insolvency of such a mutual association releases the stockholders from further payment of dues on stock. It is the almost universal holding that, in the settlement of the affairs of an insolvent mutual association, a borrowing member, whose stock has not matured, shall be held for the amount of money actually received by him, with interest thereon, less the premium actually paid by him for the loan, and less the interest on the monthly payments of interest made by him. This rule applies to cases where the affairs of the association are not so far settled as to ascertain the value of the stock. When the value of the stock can be determined, the borrower would then be entitled to credit for its value in addition to the items heretofore mentioned. *Wilcoxen* v. *Smith,* 107 Ia., 555; 78 N. W., 217; 70 Am. St. Rep., 220; *Hale* v. *Cairns,* 8 N. D., 145; 77 N. W., 1010; 44 L. R. A., 261; 73 Am. St. Rep., 746; *Phelps* v. *Association,* 121 Mich., 343; 80 N. W., 120; *Leahy* v. *Association,* 100 Wis., 555; 76 N. W., 625; 69 Am. St. Rep., 945; *Knutson* v. *Association,* 67 Minn., 201; 69 N. W., 889; 64 Am. St. Rep., 410; *Rogers* v. *Hargo,* 92 Tenn., 35; 20 S. W., 430; *Weir* v. *Association,* 56 N. J. Eq., 234; 38 Atl., 643; *Curtis* v. *Association,* 69 Conn., 6; 36 Atl., 1023; 61 Am. St. Rep., 17 (and see note to this case, p. 24, 61 Am. St. Rep.); *People* v. *Lowe,* 117 N. Y., 175; 22 N. E., 1016 (see also, End. Bldg. Ass'ns [2d ed.], 477); Am. & Eng. Ency. Law (2d ed.); 1080; *Post* v. *Associa-*

*tion,* 97 Tenn., 408; 37 S. W., 216; 34 L. R. A., 201; *Strohen* v. *Association,* 115 Pa., 273; 8 Atl., 843." In the latter opinion, *supra,* Judge Brannon says: "Seeing that, upon insolvency of a building association, it must be wound up, and to that end that its borrowing members, though their debts are not yet payable, must pay up at once, the question is one of account between them and the association. How shall they be charged? I answer, with debt and interest. End. Bldg. Ass'ns, 528-531. With what shall they be credited? I answer, with payments made expressly on such indebtedness, and with fines and premiums, but not with periodical dues paid on stock. End. Bldg. Ass'ns, 477. . . . . Counsel for the knitting companies say, as above stated, that when those companies made the contracts of loan, and assigned their stock for security for the debt, and the contract gave them the power to pay dues on stock up to a certain amount, and thereby cancel their indebtedness, they were not members in future, and cannot be held to be still paying dues on stock; that such payments are not to be credited on stock, as would be the case of non-borrowing members, but all payments of dues must go on their indebtedness. The proposition that they cease to be members is not sound in law. They still continued members of the association. 7 Thomp. Corp., secs. 8772, 8773, where it is stated that only Virginia and the District of Columbia have held that the relation of stockholder ceases under the circumstances stated above. See same work, p. 332, saying: 'The member, as a borrower, is still a member, with all his rights, except as pledged. He may vote, hold office, transfer his shares, subject to the lien, and do everything another shareholder may do.' *Lister* v. *Association,* 38 Md., 115, holds the same doctrine. So End. Bldg. Ass'ns, sec. 123. See 5 Am. & Eng. Dec. Eq., 234. To sustain the proposition that when these borrowing members gave their bond for the advance of money, and assigned their stock as collateral, they ceased to be members, and were absolved from all obligations to sustain any share of losses, we are cited to

End. Bld. Ass'ns, sec. 81, reading thus: 'The liability to contribute to expenses ceases with the cessation of membership *bona fide,* and with the consent of the association. If, upon becoming a borrower, the member relinquishes his membership, or if, being an investor merely, he avails himself of a provision in the rules or by-laws of the association, or of the statute supreme over it, to withdraw himself from it, he cannot subsequently be made liable for its debts and losses, and called upon by the society to contribute toward their payment.' Clearly so. If he relinquishes his membership or withdraws, he is no longer a member; but merely borrowing, giving bond and pledging stock as collateral, do not lose him the benefits or release him from the obligations of membership. . . . . Being still a member after such borrowing, the party occupies the twofold character of debtor and stockholder, and his payments on debts are payments of debts, and his payments on stock are payments on stock—so intended in both cases. When insolvency comes, he is still a member of the association, organized as well for his benefit as that of other members; and other members not borrowing are entitled to call upon him to still occupy the status of a member, and help bear the burden of disaster. He has no right to apply his stock payments on his indebtedness. When insolvency comes, the original plan of the association is defeated. Such operations as were contemplated by all members, borrowers, and non-borrowers, are unavoidably frustrated. They cannot be accomplished. The association cannot demand further payments on stock, because, its business being stopped, it cannot apply such payments to effect the design for which they were stipulated to be made, and the consideration for their payment has ceased. Close up the affairs of the association is the only alternative. To do this, outstanding debts must be paid, chiefly from debts due from members, though not yet mature, because the association owns these debts as material assets, and indispensable to pay outstanding debts, and then to be divided among stockholders. The

member who is a borrower, as such, occupies the position of a borrower. The relation between the association and him makes him its debtor for the money advanced to him, and he must pay at once, to enable the association to do the only thing it can do—wind up. Out of the assets, including this indebtedness of this stockholder, a division is made, after payment of debts among the stockholders, including this borrowing stockholder. His stock is worth what his dues and other sources of revenue make it worth. What he paid in dues must go on his stock, to constitute the capital stock, as he contracted to pay such dues on his shares of stock, not on his debt. Here he is a stockholder, not a debtor. His contract of subscription is for stock, and his dues go on that by contract. Only in one event, by the contract, can those dues paid for stock go to pay the debt; that is, when, in case of success of the association, those dues, with dues from other members and other sources of income, bring the stock to par, and thus discharge the debt, by the letter of the contract. But that being defeated by disaster, the set-off of stock against debts cannot be made. The member cannot be allowed to go on paying dues, in specific performance of the contract, for the company is incompetent to go on. The time has come when the outside debts must be paid—when members must suffer some loss. It is obvious, they ought to suffer this loss equally—borrowing and non-borrowing stockholders. Now, if you credit A's dues paid on his stock upon his debt, he gets the benefit of them in full, whereas B, who has no money borrowed from the association, but who paid the same amount of dues as A, gets no benefit from those dues. This, in justice, cannot be allowed. So the true rule is, in case of insolvency, to keep A in his twofold character—debtor and stockholder. Make him pay back to the common treasury what he borrowed from it, and thus end his relation of debtor; and later, when the assets have been collected, and the divisible fund, after the payment of debts, is found, give him his share in that fund, much or little. All shareholders will thus stand equal. There

are some authorities *contra,* but the great current of authority, the latest and best considered, as building associations have increased, sustain this position. In the great case, *Strohen* v. *Association,* 115 Pa., 273; 8 Atl., 843, the court stated the matter thus: 'The insolvency of the company puts an end to its operation as a building association. To a certain extent, it also ends the contracts between it and its members, and nothing remains but to wind it up in such manner as to do equity to creditors and between the members themselves. As regards the latter, care should be taken to adjust the burden equally, and not throw on either the borrowers or non-borrowers more than their respective share. That result may be reached by requiring the borrower to repay what he actually received, with interest. He would then be entitled, after the debts are paid, to a pro rata dividend with the non-borrower of what he had paid upon his stock. He will thus be obliged to bear his proper share of losses. To allow him to credit upon his mortgage his payments on his stock would enable him to escape responsibility for his share of the losses, and throw them wholly upon the non-borrowers. In other words, the borrower would escape without loss. It will not do to administer the affairs of an insolvent corporation in this manner.' To same effect, see 5 Am. & Eng. Dec. Eq., 254; *Leahy* v. *Association* (Wis.), 76 N. W., 625; 69 Am. St. Rep., 945; 5 Am. & Eng. Eq., 206; *Price* v. *Kendall* (Tex. Civ. App., 1896), 36 S. W., 810; *Eversmann* v. *Schmitt,* 53 Ohio St., 174; 41 N. E., 139; 29 L. R. A., 184; 53 Am. St. Rep., 632; *Weir* v. *Association* (N. J. Ch.), 38 Atl., 643; *Wohlford* v. *Association,* 140 Ind., 662; 40 N. E., 694; 29 L. R. A., 177; *Post* v. *Association,* 97 Tenn., 408; 37 S. W., 216; 34 L. R. A., 201; Thomp. Bldg. Ass'ns, 396."

It follows from these views that the accounting in these cases was had upon the wrong basis. It should be remarked that the law of building and loan associations is just now assuming definite shape, and the learned and accomplished chancellor be-

low could hardly be expected to anticipate a doctrine as to accounting just now being for the first time firmly established.

There is only one other point that we will notice in these cases, and that is this: that these suits are not administration suits—not being brought as such. We do not think, however, that the form in which the suit has been brought should dominate the method of accounting. What these borrowers are equitably entitled to, they should receive; but they should receive only that, whether the suits be administration suits or not. The equities by which the substantial rights are determined cannot be made more or less by the particular procedure resorted to. On the return of these cases into the chancery court, if there can be an estimate made of the value of the shares of these borrowers, such as will certainly not give them more than the shares will be worth on a final settlement, such ascertained value of the shares may be credited on the loan. If not, no stock dues should be credited on the loan, but the borrowers should be remitted to their right to receive whatever the value of these shares my be, when finally ascertained by the proper procedure.

*Both cases reversed and remanded.*