## FEDERAL SAVINGS & LOAN ASS'N v. BAXTER.

No. 27992.    June 20, 1939.

E. C. Stanard, Leonard Carey, Norton Stanard, and R. L. Flynn, all of Shawnee, for plaintiff in error.

Pryor & Sandlin and C. E. Wilson, all of Holdenville, for defendant in error.

DANNER, J. On June 20, 1923, Beatrice M. Hall became a member of the Federal Savings & Loan Association of Oklahoma, a domestic building and loan association, plaintiff in error, by having issued to her certificate No. 245, representing 20 shares of class A installment shares of the capital stock of said association of $100 per share.

On the same date the owner of the stock assigned it to the building and loan association as collateral to a loan of $2,000 evidenced by a note executed by Beatrice M. Hall and her then husband, W. F. Hall, whereby the promissors agreed to repay the amount borrowed, and to liquidate the stock

obligation, by the payment of $10 as monthly dues and the sum of $16.66 interest and premium due monthly upon the sum borrowed in accordance with the by-laws of said association. Among other provisions in the note is the following:

"And we promise to pay said Association all of said sums of money, amounting in the aggregate to twenty-six & 66/100 dollars on or before the 20th of each and every month until each of such shares reach the value of $100.00 or said loan shall be otherwise sooner canceled or discharged."

As security for the payments provided for in the note the makers executed and delivered to the association a mortgage on the real estate involved in this action. The mortgage recited the purchase of the stock and the execution of the note and provided for the liquidation of the stock and the note under the terms provided therein.

Afterward the purchaser of the stock and the makers of the note and mortgagors died and in this action, instituted by the association to recover on the note and to foreclose the mortgage, the defendant in error was made party defendant as the surviving husband and heir of Beatrice M. Hall Baxter, deceased. Others not concerned in this appeal were made additional parties defendant.

The defendant prevailed in the trial court on the basis of an allegation in his answer, as amended, to the effect that at the time the loan was negotiated it was agreed between the makers of the note and the association, or its representative, that the indebtedness was to be retired in ten years upon payment to the association of $26.66 per month, which sum represented dues and interest; that payments, as indicated, had been made regularly during the ten-year period, thereby liquidating the debt in full. In support of the allegation of fraud, E. I. Wakeman, a witness for the defendant, testified that at the time the loan was under consideration he was the local representative of the plaintiff in Holdenville in the solicitation of loans. Being unfamiliar with the business, he had a Mr. Stephenson, a representative of the association from its main office, come to Holdenville and interview Mrs. Hall concerning the making of the loan. In this connection the witness testified:

"Q. You witnessed her signature to all these various written instruments, didn't you? A. I think so. Q. You were present when she executed all these instruments, were you not? A. Yes, sir. Q. And she took each instrument and read it, didn't she, before she signed it? A. Yes. Q. And examined it carefully, didn't she? A. Yes, she took her time to it. Q. And especially read the note carefully before she signed that? A. Yes.

Q. Now, Mr. Wakeman, if I understand your testimony, you didn't hear very much of the conversation between Kem Stephenson and Mrs. Hall, did you? A. I heard a part of it. There were folks in and out of the office. Q. You were coming and going and the telephone was ringing and various things like that? A. Yes, sir. I listened to as much of it as I could under those circumstances. Q. And you don't know what all was said in that conversation, do you? A. No, sometimes they would be conversing when I would be talking over the phone. Q. And you don't make any pretense of remembering what was said in that conversation? A. Not the exact language, I couldn't at this time. * * * A. I know she was asking about that and it was my recollection that is what was told her. that it was a 120 pay loan, but I can't tell you just what the conversation was, my memory don't serve me fourteen years ago."

Both the witness and the defendant testified to a conversation had with a representative of the association in 1933, ten years subsequent to the execution of the note and mortgage. Referring to this conversation, the defendant testified as follows:

"Q. Go ahead, Mr. Baxter, tell what was said in that conversation. A. Well, he came down and he wanted me to give him a note for $500 and give him a dollar and a few cents, and I said 'What is that for? I only owe you $53.' He says, 'Well, we quit paying dividends.' He said, 'July 1, 1931,' and he says, 'Therefore, you haven't been drawing anything for your money up there.' I said, 'Well, you have been charging it,' and I said 'It was 120-Pay, wasn't it?' and he said 'Yes, but times have changed now.' That is the way he said it."

Kem Stephenson, a witness for the plaintiff, present when the note and mortgage were executed, in his testimony denied that he advised the borrower that the loan contract would mature in any definite number of months.

It is unnecessary to cite authorities in support of the conclusion that defendant's testimony on the question of fraud was wholly insufficient to affect the contract sued upon.

The plaintiff contends that the judgment is contrary to the law and to the evidence; also, that the court erred in its instructions to the jury.

Section 9858, O. S. 1931, 18 Okla. St. Ann. sec. 353, which statute was in force at the time the present contract was executed, specifically authorized building and loan associations doing business in this state to issue its stock in full paid, prepaid and installment shares in such amounts and at such times and in such manner as its by-laws may provide. Walker et al. v. Local Building & Loan Association, 176 Okla. 168, 54 P.2d

1078. The statutes are silent on the authority of building and loan associations to issue its stock to mature on any given number of monthly payments. In this situation the general rule is against establishing a fixed maturity date as being contrary to the operating plans and mutual character of building and loan association. 9 C. J. 935. The general rule is set out in 12 C. J. S., page 433, as follows:

"It is the general rule that stock matures when the fund in which a shareholder has an interest actually amounts to the sum per share specified in the articles of association. In other words, the stock matures when all the payments thereon, together with the profits apportioned to it, total the amount fixed as the par value thereof, without any action by the board of directors, and it does not mature until that time, notwithstanding an agreement on the part of the association that the stock shall mature on a particular date, since, as already considered in paragraph 22d, such contracts are usually considered ultra vires. Also members and stockholders are charged with notice of statutes and by-laws making the time of maturity depend on the exigencies of business rather than on the making of payments for a fixed period, and a new agreement changing the period of maturity from a fixed to an indefinite time is binding on the parties." McPherson v. Railway Savings & Bldg. Ass'n (Colo.) 25 P.2d 388; Intermountain Bldg. & Loan Ass'n v. Casper Mutual Bldg. & Loan Ass'n (Wyo.) 28 P.2d 103, 90 A. L. R. 1426; Miller v. Eastern Bldg. & Loan Ass'n (Tenn.) 53 S. W. 231.

In the present case the certificate of stock recited that it was issued and accepted subject to the by-laws of the association. Unless contrary to statutory provisions, by-laws of a building and loan association are taken as its law. Section 9812, O. S. 1931, 18 Okla. St. Ann. sec. 223. In the case under consideration the by-laws of the association provided that "Class A stock shall be sold on a monthly payment of 50 cents per share for 128 months. * * * If these respective classes of stock have not matured in the specified number of months, the shareholders shall have the privilege of continuing the monthly payments until they have matured, or withdrawing the total amount paid in together with all dividends credited thereto, less all fines, fees, and other charges or deductions, if any, due the association."

Another section of the by-laws provides:

"Whenever the installments paid in together with the earnings credited on any class of installment and prepaid stock, less all fines, fees, and other charges or deductions, if any due the Association, shall equal One Hundred Dollars ($100.00) per share,

all payments of dues shall cease and it shall be deemed matured. * * *"

These provisions in the by-laws amounted to nothing more than an estimate of the maturity date of the stock. 9 C. J. 935; 9 Am. Jur. 110; Myers v. Alpena Loan & Bldg. Ass'n (Mich.) 75 N. W. 944; O'Malley v. People's Bldg. Loan & Savings Ass'n. (N. Y.) 36 N. Y. S. 1016; Johnson v. Nat'l Bldg. & Loan (Ala.) 28 So. 2, 82 Am. St. Rep. 257; Campbell v. Eastern Bldg. & Loan Ass'n (Va.) 37 S. E. 350; Schell v. Equitable Loan & Inv. Ass'n (Mo.) 51 S. W. 406; Bertche v. Equitable Loan & Inv. Ass'n of Sedalia et al. (Mo.) 48 S. W. 954; Wiley v. Commonwealth Loan & Sav's Ass'n (Ind.) 86 N. E. 1032; Hough v. Maupin (Ark.) 84 S. W. 717; Farm & Home Sav's & Loan Ass'n v. Martin (Tex.) 88 S. W.2d 459.

In the present case, as in many others under like conditions, the difficulty arises in the failure of the association, during the depression, to earn sufficient money from its investments to pay dividends on its outstanding stock. As dividends were passed, credits on the stock from that source ceased. This, necessarily, extended the period of the maturity of the stock beyond the time estimated in the by-laws of the association and in the executed contracts. The passing of dividends not only extended the maturity of borrowing members, but likewise withheld from investing members returns on their investments which, under ordinary conditions, would inure to such members in dividends. This is in keeping with the mutuality features of building and loan associations generally. V. S. Cook Lumber Co. v. Harris, 180 Okla. 557, 71 P.2d 446.

The plan of operation of building and loan associations generally recognizes the passing of dividends as a method of preserving the solvency of such associations. Members of building and loan associations are charged with notice of statutory and by-law provisions, making the time of maturity depend upon the exigencies of business rather than on the payments for a fixed period of time. 9 C. J. 945.

Under the provisions of section 9800, O. S. 1931, 18 Okla. St. Ann. sec. 212, and section 10 of article 4 of the by-laws, the association had a lien upon the pledged stock for unpaid installments and other charges incurred thereon. Generally, under its plan of operation, a loan made by a building and loan association remains unliquidated until final settlement or maturity of the pledged shares of stock and agreements providing for cancellation of the loan upon making a certain number of payments, regardless of whether

or not the stock is matured, are void and unenforceable. 9 C. J. 978.

The rule here announced, and the reasons therefor, is succinctly stated by this court in Kelly v. Garfield County Bldg. & Loan Ass'n, 180 Okla. 253, 68 P.2d 811. In that case, in the body of the opinion, we said:

"The building and loan mortgage procedure and provisions governing same is entirely different from the ordinary commercial mortgage, in this state, at least. The failure to observe this distinction has led to a confusion that ought not to exist; the result of that confusion has been the attempt to apply the general rule applicable to ordinary mortgage loans to the association form loan. The two are not commenced or completed in a similarity of manner. Their sole similarity is the fact that a note and a real estate mortgage are executed. The method of repayment is by no means the same. Special legislation was a necessity to legalize the building and loan system. The building and loan set-up was and is for a special purpose; that purpose was to supply a special form of loan, presumptively, at least, to assist the citizen of small means to acquire a home and pay for it by small monthly installments, when he could qualify under the special provisions governing. The first necessity was to become a subscriber for stock in the corporation equal to the amount of the loan and that regardless of the value of the property security offered. That was a particular class of stock. That stock must be assigned as additional security and it is held by the corporation as collateral security; then there must be paid in a designated monthly payment; after deduction for interest, the balance of such payment must be applied, not on the principal note given, but on the stock; such payments, together with any dividends that might be declared from earnings, are applied to the payment of this stock subscribed for; when payment and earnings are sufficient, the stock is matured and the loan is cancelled; **no maturity of the loan arises until the stock is fully paid;** then the mortgage given as other security is released. **The maturity date of the note and mortgage is at all times uncertain,** since there may be no dividends to apply or the earnings may be smaller and reduce the dividends contemplated. Losses might even occur that would destroy all dividends. Therefore, the procedure is throughout predicated upon a mutuality of interests. The borrower must be a stockholder as well as borrower and participate in earnings or losses. Borrowers found that fact out during the late depression in many instances. None of these conditions exist under the ordinary form of mortgage secured loan. That consists simply of borrowing; giving security; the principal is certain; due date is certain and a definite interest rate exists; the borrower is not concerned with nor does he participate in earnings, or losses of the lender."

It is our conclusion that the judgment in this case is erroneous. Accordingly, the judgment is reversed and remanded to the trial court, with directions to vacate the judgment appealed from and to proceed otherwise in harmony with the views expressed herein.

BAYLESS, C. J., WELCH, V. C. J., and RILEY, OSBORN, CORN, GIBSON, HURST, and DAVISON, JJ., concur.